[No. E045200. Fourth Dist., Div. Two. Aug. 7, 2009.]

ELIZABETH SANCHEZ, Plaintiff and Appellant, v.
COUNTY OF SAN BERNARDINO et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., V., VI., and VII.

---

## COUNSEL

Law Offices of Granowitz, White and Weber and Bradley R. White for Plaintiff and Appellant.

Wagner & Pelayes, Alice E. Waters and Dennis E. Wagner for Defendant and Respondent County of San Bernardino.

Arias & Lockwood, Joseph Arias and Christopher D. Lockwood for Defendant and Respondent Dennis Hansberger.

---

## OPINION

**RICHLI, J.**—Plaintiff Elizabeth Sanchez was a high-ranking employee of the County of San Bernardino (the County), widely regarded as a "rising superstar." Among her other accomplishments, she negotiated a labor contract with the Safety Employees Benefits Association (the Association), the labor union responsible for representing sheriff's deputies. Thereafter, however, she and James Erwin, the president of the Association, began having "a physical romantic relationship." She denies that this created any actual conflict of interest, because, she maintains, she was never involved in any further negotiations with either Erwin or the Association. Nevertheless, when her supervisor discovered the relationship, he insisted that she resign.

The County and Sanchez entered into a written severance agreement, which provided that neither side would disclose "the facts, events and issues which gave rise to this Agreement . . . ." Despite this confidentiality provision, newspaper articles appeared almost immediately that quoted county representatives—including Supervisor Dennis Hansberger—to the effect that Sanchez had resigned due to a "conflict of interest" arising out of an " 'improper' relationship" with Erwin.

Sanchez then filed this action against the County and Hansberger for, among other things, breach of contract, promissory fraud, invasion of privacy and intentional infliction of emotional distress. The trial court granted summary adjudication on these causes of action in favor of defendants.

■ In the published portion of this opinion, we will hold that the trial court erred by granting summary adjudication on Sanchez's cause of action for breach of contract. The trial court essentially reasoned that the confidentiality provision was void as against public policy, because the County supposedly had a duty to make the disclosures that it did. However, while the County may have had a duty to disclose the severance agreement itself (at

least on request), it had no such duty to disclose the circumstances that gave rise to the severance agreement. Moreover, while the County claims that it had a First Amendment right to make the disclosures, any such right was waived by the confidentiality provision.

In the unpublished portion of this opinion, however, we will uphold the summary adjudication of Sanchez's other causes of action.

I.

PROCEDURAL BACKGROUND

In 2005, Sanchez filed this action against the County and Hansberger. She asserted 10 causes of action:

First: Breach of contract (against the County only).

Second: Promissory fraud (against the County only).

Third through sixth: Slander, each based on a different set of allegedly false statements.

Seventh: Invasion of privacy by public disclosure of private facts.

Eighth: Intentional interference with prospective economic advantage.

Ninth: Misrepresentation to prevent a former employee from obtaining employment. (Lab. Code, § 1050.)

Tenth: Intentional infliction of emotional distress.

The County filed a special motion to strike (strategic lawsuit against public participation (SLAPP) motion). (Code Civ. Proc., § 425.16.) The trial court denied the motion with respect to the first, second, seventh, and tenth causes of action; however, it granted the motion with respect to the third through sixth and the eighth through ninth causes of action. Sanchez did not appeal. (See Code Civ. Proc., § 425.16, subd. (i).)

The County and Hansberger then filed motions for summary judgment on the first, second, seventh, and tenth causes of action. The trial court granted both motions. Accordingly, it entered judgment against Sanchez and in favor of the County.

The trial court ruled, however, that the third through sixth and eighth through ninth causes of action were still pending as against as against Hansberger, because he had neither filed a SLAPP motion of his own nor joined in the County's. Hansberger therefore brought a second motion for summary judgment with respect to the remaining causes of action. Sanchez did not oppose Hansberger's second motion for summary judgment, which was granted. The trial court then entered judgment against Sanchez and in favor of Hansberger.

Sanchez filed a timely notice of appeal from each judgment.

## II.

## FACTUAL BACKGROUND

### A. *Preliminary Evidentiary Issues.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *Facts Shown by the Evidence.*

Sanchez began working for the County in 1987. Over the years, she was given a number of promotions. In July 2000, she was named chief of the employee relations division. As such, she was the County's chief labor negotiator and its principal advisor on employee relations.

Around September 2002, the County began negotiations with the Association toward a new memorandum of understanding (MOU).[1] Sanchez was the chief negotiator for the County. James Erwin was the president of the Association. However, he was not the lead negotiator for the Association, and he participated in the negotiations over the MOU only infrequently. By March 2003, the board of supervisors had adopted the MOU.

In May 2003, Sanchez and Erwin "began a physical romantic relationship." At the time, each of them was already married to someone else.

The County's personnel rules included the following "Conflict of Interest" provision: "No official or employee . . . shall have a financial or other personal interest or association which is in conflict with the proper discharge

---

[*]See footnote, *ante*, page 516.

[1] Technically, two MOU's were negotiated concurrently, one covering the safety unit and one covering the safety management and supervisory unit. The distinction between them is not significant for our purposes.

of official duties or would tend to impair independence of judgment or action in the performance of official duties. Personal as distinguished from financial interest includes an interest arising from blood or marriage relationships or close business, personal, or political association."

Sanchez recognized that the relationship was "inappropriate," but only because there could be "the appearance of a conflict of interest"; in her opinion, there was never any actual conflict of interest. As she acknowledged, it was theoretically possible that issues could have arisen regarding an amendment or an interpretation of the MOU such that she would have had an actual conflict of interest. However, we assume, for purposes of argument, that there was a triable issue of fact as to whether this ever actually occurred once the affair was in progress.[2]

After the affair had begun, Erwin and Sanchez gave each other a number of gifts. Erwin's gifts to Sanchez included diamond earrings, a necklace, and a $350 Raymond Weil watch. In October 2003, he gave her $5,000 in cash. Sometime in 2004, he gave her an additional $2,000 in cash.

Sanchez was legally required to disclose most gifts and loans that she received by filing a "Statement of Economic Interests," also known as a "form 700." However, she did not disclose any of these gifts from Erwin. She relied on legal advice from county counsel to the effect that she was not required to disclose gifts received in the context of a dating relationship. The Fair Political Practices Commission had in fact issued an advice letter stating, "Gifts of a personal nature received in a 'bona fide dating relationship' are

---

[2] Defendants identify four issues that they claim arose after the affair was already in progress and thus created an actual conflict of interest:

1. The "3 percent at 50" retirement formula: One provision of the MOU required the County to adopt a certain retirement formula, contingent upon the settlement of some related litigation. Apparently the settlement did occur, and by October 2003, the board had adopted the formula. However, there was evidence that its adoption was ministerial; if the board had not adopted the formula, the County would have been in breach of the MOU. In any event, Sanchez "was not involved in those things."

2. Application to 30-year employees: Around October 2003, Sanchez was called upon to decide whether the MOU required 30-year employees to make additional contributions in order to qualify for "3 percent at 50." However, there was evidence that this was a dispute between the County and the San Bernardino County Employee Retirement Association, not the Association; the Association actually supported the County's position.

3. Creating an additional bargaining unit: At some point during 2004, the Association wanted to create an additional bargaining unit. Sanchez "was dealing with" Erwin concerning this issue. However, she opposed his position, and she so advised the board.

4. Merging coroner's investigators into the sheriff's department: The evidence on this point consisted of a series of e-mails sent to or from Sanchez. The e-mails are hardly self-explanatory; they presuppose a certain preexisting familiarity with the subject. No witness ever testified to what the e-mails meant. We cannot say that they demonstrated an actual conflict beyond a triable issue of fact.

not subject to the reporting or gift limitation provisions of the [Political Reform] Act." (Boldface omitted.)

In July 2004, Sanchez was promoted to director of human resources. At that point, her supervisor was County Administrative Officer Mark Uffer. By August 2004, Uffer had heard a rumor about a relationship between Sanchez and Erwin. He "confronted" Sanchez about this, but she "lied to him about the existence of [the] relationship . . . ."

Meanwhile, in December 2003, Sanchez had filed for divorce. In September 2004, her divorce became final. By October or November 2004, however, her relationship with Erwin had become strained.

On December 14, 2004, Erwin drove Sanchez to a restaurant for lunch. Once there, Sanchez broke up with him. He was angry and remarked, "You better find another job." She took this as a threat. She told him to leave the restaurant without her. She then called Uffer and asked him for a ride back to the office. During the ride, she disclosed the true nature of her relationship with Erwin.

On December 20, 2004, Uffer told Sanchez that she needed to resign. He presented her with a "Compromise, Release and Settlement Agreement" (some capitalization omitted; hereafter Severance Agreement) that had been drafted by county counsel. It provided that Sanchez would execute a letter of resignation immediately, although her resignation would not be effective until April 20, 2004; until then, she would be on paid leave.

It also included the following confidentiality provision: "To the maximum extent permitted by law, the parties further agree that this Agreement, the terms and conditions of this Agreement, the facts, events and issues which gave rise to this Agreement, and any and all actions by Ms. Sanchez and the County in accordance therewith, are strictly confidential and shall not be disclosed or discussed with any other persons, entities or organizations, whether within or without the County, except as may be required by applicable law." Sanchez accepted and signed the Severance Agreement.

Starting on December 22, 2004, a number of newspaper articles reported on Sanchez's resignation. They named Uffer and Hansberger as sources. Hansberger reportedly stated that Sanchez had "resigned after disclosing that she had an improper relationship with [Erwin,] the president of the union that represents sheriff's deputies . . . ." Uffer reportedly stated that Sanchez had "created a conflict of interest that required her to leave," although he indicated that this was "a conflict of the heart," rather than a financial or legal conflict.

Some of the articles made it clear that the supposed conflict had not existed when Sanchez was negotiating the MOU. However, an article in the Los Angeles Times was somewhat more equivocal; it stated that "Sanchez's conflict of interest grew out of that negotiation process."

In January 2005, Uffer directed Sanchez to file amended form 700's reflecting any and all gifts or loans from Erwin. Accordingly, she filed amended form 700's. Even though the $5,000 and $2,000 had been gifts, she reported them as loans. She testified, however, that this was Uffer's idea.

Shortly thereafter, there was a new round of articles, again reporting that Sanchez had resigned after disclosing her affair with Erwin. These articles also reported for the first time—apparently based on Sanchez's amended form 700's—that Sanchez had received gifts and a loan from Erwin. Hansberger reportedly stated that "Erwin knew that a loan and gifts he gave Sanchez while their relationship was secret made her vulnerable to pressure to grant the union concessions." Hansberger also stated that Sanchez had "created an intolerable conflict of interest." He added, "You do not have a personal relationship with the people on the opposite end of the negotiating table . . . ."

Uffer retained outside counsel to investigate whether Sanchez's relationship with Erwin had violated County policy. On February 9, 2005, the report by outside counsel (Andrus Report) was completed. It accepted that Sanchez and Erwin's personal relationship had not begun until May 2003. It concluded that:

"1. The relationship between . . . Sanchez and . . . Erwin violated the County's Personnel Rule . . . .

"2. The relationship between . . . Sanchez and . . . Erwin did not have an adverse financial impact on [the] County; nor was there direct evidence that the County was disadvantaged by the relationship in any specific manner." (Underscoring omitted.)

On April 29, 2005, the County issued a press release setting forth the basic conclusions of the Andrus Report. This resulted in still more newspaper articles. Hansberger was said to disagree with the Andrus Report. He argued that, during the affair, the board had taken further action to approve the MOU. (See fn. 2, *ante.*) He was quoted as saying, " 'Of course it is injurious to the county. Deputies who retired at age 50 could be earning 100 percent or more than 100 percent based on this package.' " He also reportedly believed that Sanchez had been required to disclose the gifts from Erwin, because "[t]wo people married to others cannot have a bona fide dating relationship with each other . . . ."

Also in April 2005, the Association hired Erwin as its chief of administration. In a newspaper article on the hiring, Hansberger was said to have commented that "he believes Erwin giving Sanchez gifts at a time when they were negotiating multi-million-dollar contracts amounted to bribery."

Meanwhile, around January 2005, Sanchez and Erwin had reconciled. At least as of mid-2007, they continued to have a "serious, ongoing, personal and romantic relationship . . . ."

## III.

### STANDARD OF REVIEW

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) "[I]n moving for summary judgment, a 'defendant . . . has met' his 'burden . . . if' he 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. . . .' [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "We review the trial court's decision de novo . . . . [Citations.]" (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66 [99 Cal.Rptr.2d 316, 5 P.3d 874].)

### IV.

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

A. *Additional Factual and Procedural Background.*

The County argued that it was entitled to summary judgment on the entire complaint under the First Amendment.

The County also argued that it was entitled to summary adjudication on the first cause of action, for breach of contract, because (1) it had a duty to disclose Sanchez's misconduct, and therefore (a) the confidentiality provision was void as against public policy, and (b) the County's disclosures were privileged under Civil Code section 47; (2) Sanchez herself had breached and/or waived the confidentiality provision by disclosing the circumstances of

her resignation to her family and to Erwin; and (3) Sanchez could not establish that the County's disclosures had caused her any damages.

The trial court granted summary adjudication on the first cause of action on the ground that the confidentiality provision was void as against public policy.

B. *Analysis.*

1. *The validity of the confidentiality provision.*

In arguing that the confidentiality provision was contrary to public policy and hence void, the County relies on *BRV, Inc. v. Superior Court* (2006) 143 Cal.App.4th 742 [49 Cal.Rptr.3d 519].

The precise issue in *BRV* was the scope of the personnel file exception to the California Public Records Act (Public Records Act; Gov. Code, § 6250 et seq.). The Public Records Act in general provides that "every person has a right to inspect any public record . . . ." (Gov. Code, § 6253, subd. (a).) However, it also creates a number of exceptions, including an exception for "[p]ersonnel . . . files, the disclosure of which would constitute an unwarranted invasion of personal privacy." (Gov. Code, § 6254, subd. (c).)

In *BRV*, a school district had received complaints about Robert Morris, who was the superintendent of the district as well as the principal of a high school in the district. (*BRV, Inc. v. Superior Court, supra,* 143 Cal.App.4th at p. 747.) It asked Diane Davis, a private investigator, to interview witnesses and to produce a report "regarding the truth of the complaints and whether the evidence provided by the complainants supported the allegations." (*Id.* at pp. 747–748.) After Davis submitted her report to the district, the district and Morris entered into an agreement pursuant to which Morris resigned, and the district promised to seal the Davis report and not to release any information about the investigation " 'except as required by law or in accordance with any court order or subpoena.' " (*Id.* at pp. 748–749.) When a newspaper made a Public Records Act request for the Davis report, the district refused to release it. The newspaper then sued. The trial court ruled that almost all of the report was exempt from disclosure under the personnel file exemption. (143 Cal.App.4th at p. 749.)

The appellate court reversed, holding that, under the balancing test applicable to the personnel file exemption (*BRV, Inc. v. Superior Court, supra,* 143 Cal.App.4th at p. 755), the public's interest in disclosure outweighed Morris's "significant privacy interest." (*Id.* at p. 757; see also *id.* at pp. 757–759.) It

observed: "Without doubt, the public has a significant interest in the professional competence and conduct of a school district superintendent and high school principal. It also has a significant interest in knowing how the District's Board conducts its business, and in particular, how the Board responds to allegations of misconduct committed by the District's chief administrator." (*Id.* at p. 757.) "Here, members of the public were greatly concerned about the behavior of the city's high school superintendent and his governing elected board in responding to their complaints. Indeed, from the public's viewpoint, the District appeared to have entered into a 'sweetheart deal' to buy out the superintendent from his employment without having to respond to the public accusations of misconduct. The public's interest in judging how the elected board treated this situation far outweighed the Board's or Morris's interest in keeping the matter quiet. Because of Morris's position of authority as a public official and the public nature of the allegations, the public's interest in disclosure outweighed Morris's interest in preventing disclosure of the Davis report." (*Id.* at p. 759.)

Sanchez argues that *BRV* is not controlling here, for a number of reasons. For one thing, she argues that it never held that the confidentiality provision in the case before it was against public policy or void. The *BRV* court, however, did note the *existence* of the confidentiality provision; plainly it was aware that the provision was at least potentially significant. Although it did not mention it again, we believe that is because the confidentiality provision there—just like the confidentiality provision in this case—expressly carved out any disclosures that were required by law. Once the *BRV* court held that the Public Records Act required the disclosure of the Davis report, it implicitly—but necessarily—also held that its disclosure did not violate the confidentiality provision. Had there *not* been such a "carve out," however, the confidentiality provision *would have* violated the Public Records Act and therefore *would have* been void as against public policy. (Cf. *Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 133–137 [99 Cal.Rptr.2d 417] [confidentiality provision in settlement agreement between broker and customer was against public policy and void because it conflicted with regulatory rules requiring disclosure].)

Sanchez also argues that *BRV* is not controlling because it involved a request for a particular document under the Public Records Act. This time, we agree. Here, there has been no such request. Moreover, when the County made its disclosures, the information it disclosed was not contained in any particular document. Hence, the County had no duty to disclose it, and an agreement not to disclose it was not against public policy.

If there had been a Public Records Act request for the Severance Agreement itself, arguably the County would have had to disclose it. This would

not have violated the confidentiality provision, because it would have been a disclosure "required by applicable law." However, it does not appear that there ever was such a request. Even more important, merely disclosing the Severance Agreement would not have disclosed any of the circumstances surrounding Sanchez's resignation.

■ Sometime *after* the County made its initial disclosures, it received the Andrus Report. However, unlike the Davis report in *BRV*, which was prepared by a private investigator, the Andrus Report was prepared by an attorney. Accordingly, the Andrus Report was prominently labeled, "Attorney-Client Confidential Communication." (Italics and underscoring omitted.) The Public Records Act does not require the disclosure of a document that is subject to the attorney-client privilege. (Gov. Code, § 6254, subd. (k); *STI Outdoor v. Superior Court* (2001) 91 Cal.App.4th 334, 340–341 [109 Cal.Rptr.2d 865].) Thus, unless and until the County waived the privilege, the Public Records Act did not require it to disclose the Andrus Report. Moreover, the confidentiality provision essentially made it a breach of contract for the County to waive the privilege.

■ The County does not point to any basis for holding the confidentiality provision void as against public policy other than under *BRV*, and hence under the Public Records Act. Admittedly, there is a broad, general public policy in favor of open government. Moreover, as we will hold in the unpublished portion of this opinion, the circumstances of Sanchez's resignation were a matter of legitimate public concern. On the other hand, this policy must be balanced against the broad, general public policy in favor of privacy. (Cal. Const., art. I, § 1; see also Gov. Code, § 6250 ["the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state"].)

■ "Historically, th[e California Supreme C]ourt has been reluctant to declare contractual provisions void or unenforceable on public policy grounds without firm legislative guidance. [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 621 [71 Cal.Rptr.2d 830, 951 P.2d 399].) " ' "[P]ublic policy" as a concept is notoriously resistant to precise definition, and . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law." ' [Citation.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 185 [83 Cal.Rptr.2d 548, 973 P.2d 527].) Thus, in the absence of a statute that required the County to make the disclosures that it did, we cannot say that the County's agreement not to make such disclosures violated public policy.

We therefore conclude that the trial court erred by granting summary adjudication on the first cause of action on the ground that the confidentiality provision was void.[3]

### 2. *The First Amendment.*

For purposes of our present discussion, we may assume that the County's statements were protected under the First Amendment. Even if so, the County can be held liable for a breach of the confidentiality provision.

■ "[I]t is possible to waive even First Amendment free speech rights by contract." (*ITT Telecom Products Corp. v. Dooley, supra,* 214 Cal.App.3d at p. 319; accord, *Charter Communications, Inc. v. County of Santa Cruz* (9th Cir. 2002) 304 F.3d 927, 935, fn. 9.) " ' "[I]t is well established that courts closely scrutinize waivers of constitutional rights, and 'indulge every reasonable presumption against a waiver.' " ' [Citation.]" (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1400 [88 Cal.Rptr.2d 843].) " 'A waiver of First Amendment rights may only be made by a "clear and compelling" relinquishment of them. [Citation.] . . .' [Citation.]" (*City of Glendale v. George* (1989) 208 Cal.App.3d 1394, 1398 [256 Cal.Rptr. 742].) Here, however, we see no way to construe the confidentiality provision except as a waiver of whatever rights the County would otherwise have had to disclose the circumstances of Sanchez's resignation. It had been drafted by county counsel; presumably the County knew what it was doing.

### 3. *Waiver of the confidentiality provision.*

#### a. *Forfeiture/abandonment.*

The County briefly asserts that it was entitled to summary adjudication on the first cause of action in any event because Sanchez waived the confidentiality provision. However, it does not support this assertion with any reasoned argument or citation of authority. Its brief does not so much as mention any of the facts that it cited and relied on below in support of its waiver claim.

---

[3] In this appeal, the County has not reasserted its contention below that the alleged breach of contract was privileged under Civil Code section 47. That statute, as relevant here, provides that a publication or broadcast made "[i]n the proper discharge of an official duty" is privileged. (Civ. Code, § 47, subd. (a).) We have already concluded that the County had no duty to make the disclosures that it did. Moreover, it has been held that the privilege does not protect voluntary statements that breach an express contract of confidentiality or nondisclosure. (*Wentland v. Wass* (2005) 126 Cal.App.4th 1484, 1490–1494 [25 Cal.Rptr.3d 109]; *Paul v. Friedman* (2002) 95 Cal.App.4th 853, 869 [117 Cal.Rptr.2d 82]; *ITT Telecom Products Corp. v. Dooley* (1989) 214 Cal.App.3d 307, 317–320 [262 Cal.Rptr. 773].) We therefore conclude that the County's disclosures were not statutorily privileged.

Thus, the County appears to have all but abandoned this claim. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

Nevertheless, "[i]t is the appellant's burden to demonstrate the existence of reversible error. [Citation.]" (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766 [115 Cal.Rptr.2d 705] [Fourth Dist., Div. Two].) Even if the County had not filed a respondent's brief at all, Sanchez would not necessarily be entitled to prevail on the waiver issue. (*In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 854 [192 Cal.Rptr. 212].) Accordingly, if only out of an excess of caution, we address the issue on the merits.

### b. *Additional factual and procedural background.*

On December 21, 2004, Sanchez learned that the County and Hansberger had given information to the press and that there were going to be newspaper articles about her resignation. As a result, she contacted a few people close to her in an effort to do some "damage control."

She called her parents and "gave them very general information about what [she] anticipated was going to be in the newspaper the next day." She also called her by then ex-husband; she told him for the first time about her relationship with Erwin and added that there was going to be a newspaper article about it.

Sometime before December 23, 2004, Sanchez also told Erwin as well as several friends and coworkers that she had resigned. Later, in January or February 2005, she showed the Severance Agreement itself to Erwin.

### c. *Analysis.*

A party may waive a contract right by " 'conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.' [Citation.]" (*Pacific Business Connections, Inc. v. St. Paul Surplus Lines Ins. Co.* (2007) 150 Cal.App.4th 517, 525 [58 Cal.Rptr.3d 450]; accord, *Rheem Mfg. Co. v. United States* (1962) 57 Cal.2d 621, 626 [21 Cal.Rptr. 802, 371 P.2d 578].)

Here, Sanchez disclosed the circumstances of her resignation only to a handful of people in her immediate circle. A jury could reasonably find that this was not inconsistent with her contractual right to prevent the County from disclosing those circumstances more broadly to the news media.

Even more to the point, Sanchez made her disclosures only after she learned that the County itself had already violated the confidentiality provision. Indeed, she made some of them to protect herself from the consequences of the County's violation—to make sure that her friends and family

would hear about her affair and resignation from her before they read about them in the papers. A reasonable jury could conclude that the County's breach of the confidentiality provision excused any further performance by Sanchez. (See generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 813, p. 906.)

### 4. *Evidence of damages.*

Finally, the County argues that it was entitled to summary adjudication on the first cause of action because Sanchez could not prove any damages caused by its breach.

### a. *Additional factual and procedural background.*

After her resignation, Sanchez applied for some 200 to 250 jobs. She submitted several job applications that got as far as the background- and reference-check stage before she was told that she would not be hired. She concluded that the County's disclosures "interfered . . . with [her] capacity to get a job."

One potential public sector employer specifically told Sanchez that, based on its check of her background or references, it could not offer her a job. During an interview with another potential employer, the interviewer indicated that he "was well aware of the situation with the County"; she did not get that job.

A representative of the County of Riverside testified that at one point, he considered hiring Sanchez, and "the negative newspaper articles . . . were definitely a factor in [his] decision not to pursue her[.]"

Sometime after May 2005, Sanchez finally got a job with a hospital. However, her "overall compensation package" was less than she had enjoyed in her county job.

### b. *Analysis.*

This evidence—particularly the evidence regarding the loss of a likely job with the County of Riverside—was not merely speculative. It was sufficient to support a jury finding that the County's breach of the confidentiality provision caused Sanchez to suffer damages in the form of lost employment.

We therefore conclude that the trial court erred by granting summary adjudication on the first cause of action.

## V.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VIII.

## DISPOSITION

To the extent that the order granting summary judgment granted summary adjudication on the first cause of action, it is reversed. To the extent that it granted summary adjudication on the second, seventh, and tenth causes of action, it is affirmed. The judgment in favor of the County is reversed. The judgment in favor of Hansberger is affirmed. Sanchez is awarded costs on appeal against the County; Hansberger is awarded costs on appeal against Sanchez.

Ramirez, P. J., and Miller, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 10, 2009, S176369. Baxter, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 516.