Filed 5/25/22  BRE Atlas Prop. Owner LLC v. KS Development, LLC CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BRE ATLAS PROPERTY OWNER LLC et al., <br><br> Plaintiffs, Cross-defendants and Respondents, <br><br> v. <br><br> KS DEVELOPMENT, LLC, <br><br> Defendant, Cross-complainant and Appellant. | B310957 <br><br> (Los Angeles County Super. Ct. No. 20STCV12247) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed.

Park & Lim, S. Young Lim and James E. Adler for Defendant, Cross-complainant and Appellant.

Paul Hastings, D. Scott Carlton, Timothy D. Reynolds and Alyssa K. Tapper for Plaintiffs, Cross-defendants and Respondents.

This breach of contract action involves an unconsummated purchase and sale of nine hotels. The parties, defendant, cross-complainant and appellant KS Development, LLC (Buyer), and plaintiffs, cross-defendants and respondents BRE Atlas Property Owner LLC, BRE SSP Property Owner LLC, BRE SH Brisbane Owner LLC, BRE Newton Hotels Property Owner LLC, BRE SSP Thousand Oaks LLC, and BRE Polygon Property Owner LLC (collectively Seller),[1] each contended the other party breached the purchase and sale agreement, and each claimed entitlement to a $9 million deposit held in escrow.

The trial court found that Buyer breached the purchase and sale agreement and that Seller was entitled to the $9 million deposit as liquidated damages. Substantial evidence supports the trial court's findings, and we therefore affirm the judgment.

## BACKGROUND

### The purchase and sale agreement

On January 3, 2020, Buyer and Seller signed an agreement for the purchase and sale of nine select service hotels located in California[2] for a total purchase price of $265 million (the PSA). The PSA specified a 45-day due diligence period (ending on

---

[1]    The Seller entities are subsidiaries of, or under the control of, Blackstone Real Estate Group.

[2]    The nine hotels were the Courtyard by Marriott San Luis Obispo, Courtyard by Marriott Thousand Oaks, Town Place Suites by Marriott Thousand Oaks, Hampton Inn & Suites Thousand Oaks, SpringHill Suites by Marriott Irvine, Homewood Suites by Hilton San Francisco, Hampton Inn & Suites West Sacramento, Residence Inn by Marriott San Marcos, and Residence Inn by Marriott Bakersfield. Select service hotels are generally room-only operations or hotels with limited services.

February 18, 2020) and an initial closing date 30 days thereafter on March 19, 2020.[3]

**Deposit and liquidated damages**

Section 2.3 of the PSA required Buyer to make two deposits totaling $9 million. The first deposit of $3 million was due upon signing the PSA. The second $6 million deposit was due at the close of the 45-day due diligence period. At any time before the close of the due diligence period, Buyer could terminate the transaction and have its initial $3 million deposit returned. At the close of the due diligence period, the entire $9 million deposit became nonrefundable; however, the parties designated the $9 million deposit as liquidated damages for breach of the PSA.

**Seller's representations, warranties, and covenants**

Section 3.2 of the PSA sets forth Seller's representations and warranties. As relevant here, section 3.2(i) states:

> "Financial Statements. The financial statements provided to Buyer with respect to each Hotel are the same financial statements that each applicable Manager has provided to Seller with respect to such Hotel with respect to the periods covered thereby, and Seller generally relies on the accuracy of such financial statements for its own use."

---

[3]   Section 7.1(b) provides that, "during the Due Diligence Period, Buyer may review at each Hotel, to the extent that such items are existing and in Seller's possession or control, the current books and records concerning such Hotel, certificates of occupancy, as built plans and specifications, surveys, rent rolls, tax statements, inventory lists, service and maintenance agreements, and other instruments, documents and agreements, reasonably requested by Buyer to investigate such Hotel . . . ."

Section 3.3 of the PSA governs amendments to and limitations on Seller's representations and warranties. Section 3.3(a) states:

"(a) <u>Amendments to Schedules</u>. Seller shall have the right to amend and supplement the representations, warranties and schedules to this Agreement from time to time prior to the Closing by providing a written copy of such amendment or supplement to Buyer; provided, however, that if any such amendment or supplement provided to Buyer after the expiration of the Due Diligence Period discloses any condition, fact or other matter that (i) is either (A) within Seller's Knowledge as of the Effective Date or (B) within Seller's reasonable control after the Effective Date and in violation of this Agreement and (ii) would materially adversely impact the ownership or value of the Assets in the aggregate (a '<u>Material Adverse Effect</u>'), then Buyer, as its sole remedy, shall have the option of (x) waiving the breach of representation or warranty and proceeding with the Closing, or (y) terminating this Agreement, in which event the Deposit (including, for the avoidance of doubt, the Non-Refundable Portion of the Deposit) shall be returned to Buyer and neither party shall have any further obligations under this Agreement other than those which explicitly survive a termination hereof."

Section 3.3(b) states:

"(b) <u>Limitations on Representations and Warranties of Seller</u> Notwithstanding anything in this Agreement to the contrary, Seller shall have no liability, and Buyer shall make no claim against Seller, for (and Buyer shall be deemed to have waived any failure of a condition hereunder by reason of) a failure of any condition or a breach of any

4

representation or warranty, covenant or other obligation of Seller under this Agreement or any amendment or supplement described in Section 3.3(a) or any document executed by Seller in connection with this Agreement (including for this purpose any matter that would have constituted a breach of Seller's representations and warranties had they been made on the Closing Date) if the failure or breach in question constitutes or results from a condition, fact or other matter that was (i) known to Buyer (i.e., within Buyer's Knowledge) prior to the expiration of the Due Diligence Period, (ii) known to Buyer (i.e., within Buyer's Knowledge) prior to Closing and Buyer proceeds with the Closing, (iii) not within Seller's Knowledge as of the Effective Date or (iv) not within the reasonable control of Seller after the Effective Date (or, if within Seller's reasonable control, not in violation of this Agreement); provided, however, and notwithstanding Seller's lack of liability and Buyer's waiver of any claim for condition, fact or other matter referenced in clause (iii) directly above, nothing referenced in clause (iii) above shall prevent Buyer from terminating this Agreement in accordance with Section 3.3(a) above and receiving a return of the Deposit. . . ."

Section 3.4 of the PSA sets forth Seller's covenants prior to closing. As relevant here, Section 3.4(b) states:

"Covenants of Seller Prior to Closing. From the Effective Date until the Closing or earlier termination of this Agreement, Seller or Seller's agents shall: [¶] . . . [¶]

"(b) Conduct of Business, Maintenance and Operation of Hotel. Continue to carry on the business and maintain the Hotels substantially in the same manner as currently conducted and maintained

5

(or if not within Seller's control under the applicable Management Agreement, use commercially reasonable efforts to cause such Manager to do so) including, to the extent expressly defined and required in each applicable Existing Franchise Agreement, maintaining all hotel operating supplies in accordance with par levels set forth therein."

**The transaction**

Buyer paid the initial $3 million deposit into escrow on January 3, 2020, commencing the 45-day due diligence period. Seller, at Buyer's request, thereafter provided 2017, 2018, and 2019 financial statements prepared by Seller's accounting staff. The financial statements were not prepared by the hotel managers themselves but contained financial data from each of the managers for the nine hotels in three formats: (1) last 12 months, (2) month to date and year to date, and (3) forecast. Seller relied on these financial statements for its own use in its business.

The close of the due diligence period coincided with the onset of the COVID-19 pandemic. Buyer became concerned about the impact of COVID-19 on the hospitality industry and Buyer's ability to obtain financing for the transaction. To address these concerns, the parties executed, on February 18, 2020, a first amendment to the PSA that gave Buyer the right, upon an additional deposit of $1 million, to extend the closing date "solely in the event that Buyer's acquisition lender states in writing that it is unable to close by the then-scheduled Closing Date due to concerns solely relating to the current COVID-19 coronavirus epidemic." Upon execution of the first amendment, Buyer deposited into escrow the $6 million due at the close of the due diligence period.

On February 21, 2020, Buyer entered into a rate lock agreement with Credit Suisse First Boston (Credit Suisse) to secure the interest rate on the loan for the acquisition.  In early March, however, Credit Suisse proposed new loan terms to Buyer.  Buyer informed Seller that Credit Suisse was threatening to revoke its loan commitment and that Buyer needed additional time to negotiate new loan agreements.

From March 11, 2020, through March 17, 2020, Seller provided additional financial information requested by Buyer, including monthly financial statements, to facilitate Buyer's negotiations with Credit Suisse.  To expedite delivery of the requested information, Seller forwarded to Buyer reports and financial statements Seller received directly from the managers of the subject hotels.

On March 13, 2020, Buyer informed Seller that it needed to extend the closing date to consider alternative financing terms presented by Credit Suisse.  That same day, the parties entered into a second amendment to the PSA extending the closing date by two weeks, from March 19, 2020, to April 1, 2020.

On March 16, 2020, Buyer requested that Seller provide either a six-month option to further extend the closing date at no additional cost or a $212 million, 24-month bridge loan to finance the acquisition.  Seller declined the request.

**Buyer's notice of election to terminate**

On March 18, 2020, Buyer terminated its rate lock agreement with Credit Suisse.  That same day, Buyer sent Seller a letter from Buyer's counsel, that alleged that Seller had violated its covenant in section 3.4(b) of the PSA because "operations, occupancies, and revenues have significantly changed as a result of the COVID-19 virus since the time that

Agreement was executed on January 3, 2020." The letter stated that hotel managers had "provided financial statements to Seller that reflect substantially different results of operations, occupancies and revenues for the respective Hotels than those reflected in the financial statements previously provided to Buyer" and that Seller had not provided any amendments or supplements to the representations, warranties, and schedules to the PSA. Buyer's letter further stated: "This letter constitutes notice that Buyer is electing the option of terminating the Agreement." The letter stated that unless Seller cured the alleged unsatisfied conditions precedent by the closing date, "Buyer will elect the option of terminating the Agreement."

On March 19, 2020, Seller responded in writing to Buyer's notice of termination. Seller's letter claimed violations of the PSA were baseless and that Buyer's letter was a "pretextual attempt to excise itself from the Agreement and seek return of the deposit through accusations against Seller." Seller's letter urged Buyer to reconsider its position and to retract its notice to terminate. Seller's letter countered that if Buyer did not do so, Seller would deem Buyer to have anticipatorily breached the PSA. Buyer did not respond to Seller's March 19, 2020 letter.

On March 19, 2020, Buyer sent an e-mail to Marriott, one of the franchisors for several of the subject hotels, saying "[d]ue to the disruptions caused by the covid-19, we are suspending any further work on this transaction. We've let Seller know that this transaction cannot move forward at this time." Later that day, Marriott's counsel asked for confirmation as to whether Buyer intended to terminate the transaction or simply put it on hold. Buyer responded, "Yes. We will be terminating PSA and

8

requesting a refund." Buyer allowed its loan commitment with Credit Suisse to expire on March 21, 2020.

**Seller's notice of election to terminate and the current lawsuit**

On March 26, 2020, Seller sent Buyer notice of its termination of the PSA based on Buyer's anticipatory breach of the agreement. That same day, Seller filed a complaint alleging claims for declaratory relief, specific performance, and breach of contract, seeking release of the $9 million deposit as liquidated damages. Buyer filed a cross-complaint on May 12, 2020, alleging claims identical to Seller and seeking the same relief.

The matter proceeded to an eight-day bench trial at which witnesses for both Buyer and Seller testified. After the trial concluded, a 24-page statement of decision issued in which the trial court found that Seller had not breached any contractual obligation; that Buyer's March 18, 2020 letter and associated conduct was a repudiation and anticipatory breach of the PSA; and that Seller was entitled to terminate the PSA and obtain the $9 million deposit as liquidated damages. Judgment was entered in Seller's favor, and this appeal followed.

## CONTENTIONS ON APPEAL

Buyer raises the following contentions on appeal:

1. Seller's failure during the due diligence period to provide Buyer with the same financial statements Seller received from the managers of the subject hotels violated section 3.2(i) of the PSA and was a material failure of a condition to closing.

2. The substantial decrease in profitability reflected in financial statement forecasts provided by Seller to Buyer during the due diligence period when compared to actual and updated

9

forecast results provided to Buyer after the due diligence period ended was a material failure of a condition to closing under the PSA.

3.  Seller breached the PSA by failing to implement at the subject hotels the same cost reducing measures for COVID-19 that Seller implemented at its other hotels.

4.  Buyer's March 18, 2020 letter was not a repudiation or anticipatory breach of the PSA.

5.  The trial court erred by finding that expiration of Buyer's loan commitment with Credit Suisse was evidence of Buyer's repudiation and anticipatory breach of the PSA.

6.  Seller's March 26, 2020 letter to Buyer was an anticipatory breach of the PSA.

## DISCUSSION

### I.    Standard of review

The parties do not dispute that the terms of the PSA are unambiguous and require no extrinsic evidence for interpretation.  Interpretation of a contract that is unambiguous and that is not based on extrinsic evidence is subject to de novo review.  (*Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1183.) Application of contractual terms to the facts and circumstances of a given case is reviewed for substantial evidence.  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.)

We review Buyer's challenge to the sufficiency of the evidence supporting the trial court's factual findings under the substantial evidence standard.  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)  "Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most

10

favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid.*)

## II.    Financial statements

Whether a breach of an obligation is material, thereby excusing performance by the other party, is ordinarily a question of fact.  (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277; see *Sanchez v. County of San Bernardino* (2009) 176 Cal.App.4th 516, 529-530.)  Substantial evidence supports the trial court's factual determination that Seller's failure to provide Buyer with the same financial statements that Seller received from the managers at each of the subject hotels was not a material breach of Seller's obligations under section 3.2(i) of the PSA.

The evidence presented at trial showed that the financial statements Seller provided to Buyer during the due diligence period contained information that did not differ materially from that contained in the financial statements that Seller received from the managers of the subject hotels.  Guy Johnston, a senior associate at Blackstone, Inc.'s real estate management team, testified at trial that the financial statements Seller provided to Buyer contained the same financial information the hotel managers provided to Seller.  Mark Sample, Seller's asset manager for the subject hotel properties, similarly testified that the hotel managers provided Seller with financial data files that Seller's accounting and finance department verified for accuracy and completeness and then reformatted for Seller's use. Johnston and Sample also testified that Seller used and relied on the same financial information that Seller provided to Buyer.

Buyer does not dispute that the financial statements it received from Seller did not differ materially from the financial information Seller received from the subject hotel managers.

11

Buyer nevertheless claims it was deprived of "the assurance of reliability it had negotiated and agreed to" in section 3.2(i) of the PSA. Buyer presented no evidence, however, that the financial information it received was unreliable, inaccurate, or in violation of the PSA. To the contrary, Buyer's executive vice president Phil Wolfgramm testified that he was familiar with the appearance and format of monthly financial reports prepared by managers for Marriott and Hilton, that he never objected to the form of the financial reports Seller provided to Buyer during the due diligence period, and that he never asked during the due diligence period for reports prepared directly by the Marriott and Hilton managers.

*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, on which Buyer relies as support for its position, is distinguishable. The court in that case found the subtenant's appointment of a receiver to be a material breach of a master lease provision prohibiting the bankruptcy, insolvency, or receivership of the lessee, despite the subtenant's continued payment of rent. (*Id.* at p. 1052.) The court found that the sublessor, who had assigned its interests and obligations under the master lease to the subtenant in exchange for the subtenant's stock, had lost the value of its consideration for the sublease. (*Id.* at p. 1055.) No such circumstances are present here.

*Sacket v. Spindler* (1967) 248 Cal.App.2d 220, which lists the factors to be considered in determining whether a breach is material, undermines rather than supports Buyer's position. The first of those factors cited by the court in *Sacket* is "[t]he extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated." (*Id.* at p. 229.) The evidence here showed that financial statements Buyer received

12

during the due diligence period contained all material financial information concerning the subject hotels that Buyer could reasonably have expected.

Substantial evidence supports the finding that Seller did not breach section 3.2(i) of the PSA.

## III. Forecasts

Buyer contends a net decline in forecasted profits for the subject hotels that became evident in March 2020 because of reduced occupancy rates triggered by COVID-19 rendered Seller's previous forecasts inaccurate[4] and resulted in a failure of condition under section 5.2(a) of the PSA. Section 5.2(a) states that Buyer's obligation to close the transaction is subject to the condition that "[e]ach of the representations and warranties made by Seller in this Agreement . . . shall be true and correct in all material respects when made and on and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date (unless such representation or warranty is made on and as of a specific date, in which case it shall be true and correct in all material respects as of such date) . . . ."[5]

---

[4] Specifically, Buyer contends financial forecasts for March 2020 that Seller provided in February 2020, which showed estimated EBITDA (earnings before interest, taxes, depreciation, and amortization) profit for the nine hotels of $2,494,359 in March 2020 and $7,159,424 in the second quarter of 2020 were inaccurate when compared to actual results for the subject hotels in March 2020, which showed aggregate profits of only $128,324 for March 2020 and an updated forecast for the second quarter of 2020, which projected a loss of $1,905,999.

[5] Section 5.2(a) provides:

The PSA contains no representation or warranty by Seller, however, with respect to financial forecasts or forecasted profits. Seller's representations and warranties are set forth in section 3.2. The only representation and warranty in that section remotely related to financial matters is 3.2(i), which states that the financial statements provided to Buyer with respect to each hotel are the same financial statements that each hotel manager

---

"Conditions to Buyer's Obligations. The obligation of Buyer to purchase and pay for the Assets is subject to the satisfaction (or waiver by Buyer) as of the Closing of the following conditions:

"(a) Representations and warranties. Each of the representations and warranties made by Seller in this Agreement (as the same may be amended or supplemented in accordance with Section 3.3) shall be true and correct in all material respects when made and on and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date (unless such representation or warranty is made on and as of a specific date, in which case it shall be true and correct in all material respects as of such date), excluding, however, any inaccuracies or changes in the representations and warranties made by Seller resulting from any action, condition or matter that (i) is expressly permitted or contemplated by the terms of this Agreement, (ii) was within Buyer's Knowledge prior to the expiration of the Due Diligence Period, or, subject to Section 3.3, prior to the Closing, (iii) was not within Seller's Knowledge as of the Effective Date or (iv) is a result of events or occurrences outside of the reasonable control of Seller after the Effective Date."

has provided to Seller and that Seller generally relies on the accuracy of those financial statements for its own use.

Even if the forecasted financial information could be deemed to be a representation and warranty by Seller, the forecasts were made as of a specific date. Buyer does not claim the forecasts were false or inaccurate on the date they were made.

Seller's representations and warranties, moreover, are limited by sections 3.3(b) and 5.2(a) of the PSA, which relieve Seller from liability for failure of any condition or breach of any representation or warranty resulting from a condition "not within the reasonable control of Seller after the Effective Date [of January 3, 2020]."[6] Buyer does not dispute that reduced hotel occupancy because of COVID-19 was outside of Seller's reasonable control. The trial court found that differences between forecasted and actual financial performance resulting from reduced occupancy levels were similarly outside of Seller's reasonable control and ability to cure.

Substantial evidence supports the trial court's determination that forecasts Buyer received after the due diligence period ended did not cause Seller's representations and warranties to be false or misleading. Multiple witnesses, including Johnston, Sample, and Byron Blount, the managing director of Blackstone, Inc.'s real estate group, testified that the monthly financial forecasts are "snapshots in time" that change

---

[6] We do not address Buyer's argument as to whether sections 3.3(b) and 5.2(a) constitute force majeure provisions, as this argument was not raised in the trial court below. (*In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 117 [issues not raised in trial court will not be addressed on appeal].)

or are updated over time as managers obtain more information. Buyer's executive vice-president Wolfgramm admitted during his testimony that monthly financial forecasts are expected to change over time.

Substantial evidence supports the determination that Seller did not breach any representation or warranty concerning forecasted profits.

## IV. Operation and maintenance of subject hotels

Substantial evidence supports the trial court's finding that Seller fulfilled its obligations under section 3.4(b) of the PSA to "[c]ontinue to carry on the business and maintain the Hotels substantially in the same manner as currently conducted and maintained" from the date the parties executed the PSA until the closing. Seller's asset manager Sample testified that each of the subject hotels was staffed, open, accepting reservations, and operating in March 2020 as they had been previously, because Seller was cognizant of its obligation to do so under the PSA. Sample contrasted operations at the subject hotels with reduced operations at approximately 100 other hotels owned by Seller at the time, where hotel staff was furloughed or laid off.

We reject Buyer's argument that Seller was required to reduce staffing at the subject hotels because of reduced occupancy resulting from COVID-19 as inconsistent with the plain language of section 3.4(b) of the PSA. The trial court found, moreover, that Buyer failed to show that retaining staffing at the subject hotels was an improper or unnecessary expense, or that employees should have been laid off to keep operations as profitable as possible.

16

## V. Buyer's March 18, 2020 letter

"[R]epudiation is ordinarily a question of fact and intent, and [whether a contract has been repudiated] must be determined by the facts in the particular case." (*Gold Min. & Water Co. v. Swinerton* (1943) 23 Cal.2d 19, 28 (*Gold Mining*).) Substantial evidence supports the trial court's factual determination that Buyer's March 18, 2020 letter and associated conduct was a repudiation of its obligations under the PSA and an anticipatory breach of contract.

The March 18, 2020 letter plainly states that it "constitutes notice that Buyer is electing the option of terminating the Agreement." Although the letter purports to condition exercise of that option on Seller's failure to cure alleged unsatisfied conditions precedent to closing, the trial court found no unsatisfied conditions existed. As discussed previously, substantial evidence supports those findings. Conditioning one's performance under a contract on actions that the other party has no duty or obligation to perform is an anticipatory breach. (*Gold Mining, supra*, 23 Cal.2d at p. 28.) An anticipatory breach is a total breach of the contract. (*Id.* at p. 29.)

Buyer never responded to Seller's March 19, 2020 letter, which gave Buyer the opportunity to "reconsider its position" with regard to terminating the PSA. Rather, Buyer's subsequent conduct further supports the trial court's finding of anticipatory breach. On March 18, 2020, the same day Buyer sent its notice of termination letter to Seller, Buyer terminated its rate lock agreement with Credit Suisse. One day later, on March 19, 2020, Buyer sent an e-mail to Marriott, one of the hotel franchisors, stating that Buyer was "suspending any further work on this transaction." The following day, on March 20, 2020, in response

17

to a request by Marriott for clarification, Buyer informed Marriott that it was terminating the PSA.

Buyer's reliance on *Thornton v. Victor Meat Co.* (1968) 260 Cal.App.2d 452, *California Canning Peach Growers v. Harris* (1928) 91 Cal.App. 654, and other cases stating that a mere threat not to perform does not constitute repudiation is misplaced. Buyer's repudiation consisted of more than a mere threat not to perform. Buyer's conduct subsequent to its March 18, 2020 letter, in addition to the letter itself, constitute substantial evidence of repudiation and anticipatory breach.

## VI.    Expiration of loan commitment

That Buyer allowed its loan commitment with Credit Suisse to expire on March 21, 2020 is further evidence of its repudiation of the PSA. Buyer's conduct in the days preceding expiration of its loan commitment—terminating its rate lock agreement with Credit Suisse, sending notice of termination of the PSA to Seller, not responding to Seller's March 19, 2020 letter urging Buyer to rescind its notice of termination, and informing Marriott that Buyer intended to terminate the PSA— amply supports the trial court's finding of anticipatory breach. Given this factual context, Buyer's allowing its loan commitment to lapse further evidences its intent to terminate the transaction with Seller.

Buyer contends the lapse of its loan commitment with Credit Suisse did not support a finding of anticipatory breach because Seller did not prove that Credit Suisse was Buyer's only source of funds. Buyer claims there was evidence that it could have financed the purchase itself or on different terms with Credit Suisse or other lenders. That evidence consists of testimony by Buyer's principal, Ronnie Lam, that Buyer in the

18

past had made an all cash purchase of a hotel in Las Vegas. Lam also testified, however, that Buyer did not proceed with an all cash purchase in this case because it risked being "out of cash" at closing. Although Lam testified that Buyer was negotiating loan terms with other banks, such as Goldman Sachs and JP Morgan, Buyer submitted no documentary evidence of negotiations with or commitments from these other lenders. As the trial court noted in its statement of decision, "[t]he Court cannot just assume Buyer had $260 million then available even if Lam says he had." The trial court further noted that had Buyer needed additional time to secure more reasonably priced financing, it could have exercised its option to extend the closing date under the parties' amendment to the PSA. Buyer did not do so.

The trial court did not err by determining that Buyer's decision to allow its loan commitment with Credit Suisse to lapse was further evidence of anticipatory breach.

## VII. Seller's March 26, 2020 letter

When a party to a bilateral contract repudiates the contract, the other party "can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties." (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 463.) As discussed, substantial evidence supports the trial court's finding that Buyer's March 18, 2020 letter and subsequent conduct constituted an anticipatory breach of the PSA. Although Seller afforded Buyer an opportunity to retract its notice of termination, Buyer did not do so. Seller was accordingly entitled to treat Buyer's repudiation as a material breach, terminate the PSA, and recover the $9 million deposit as liquidated damages. (*Ibid.*)

19

## DISPOSITION

The judgment is affirmed.  Seller shall recover its costs on appeal.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
ASHMANN-GERST, J.