Filed 7/31/14  Galeb Paving v. D.L. Falk Construction CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GALEB PAVING, INC.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>D.L. FALK CONSTRUCTION INC. et al.,<br><br>        Defendants and Respondents. | A139527 and A139708<br><br>(Alameda County<br>Super. Ct. No. HG12621201) |

Respondent D.L. Falk (Falk) was the general contractor on a public works project for the Campbell Unified School District, a project to be completed in a short time frame in the summer of 2011, before the students returned from vacation.  Appellant Galeb Paving, Inc. (Galeb) was one of the subcontractors.  Issues quickly arose between Falk and Galeb regarding Galeb's performance—more accurately, nonperformance—under the subcontract.  On August 17, the day Galeb's president assaulted Falk's project manager at the job site, Galeb was terminated.

Galeb sued Falk (and the surety), asserting four causes of action:  (1) breach of contract; (2) common count; (3) waiting time penalties; and (4) action on payment bond. The case came on for a nonjury trial and, following Galeb's case, the trial court granted Falk's motion for judgment as to all four causes of action.  We affirm.

1

# FACTUAL BACKGROUND[1]

## The Projects and the Parties

In 2011, the Campbell Union School District (District) issued general conditions, dated March 21, 2011, for the Blackford Elementary School Modernization and Construction, Phase 1 (Blackford project). The general conditions were to govern any prime contract the District might award for work on that project and any subcontract the prime contractor might award in connection with that work.

By agreement effective May 6, the District awarded the prime contract for the Blackford project to Falk. The contract price was $3,543,000. Shortly after execution of the prime contract, Falk executed a payment bond on the project, with Liberty Mutual Insurance Company (Liberty Mutual) as surety.

The prime contract required Falk to perform all work on the project, directly or through subcontractors; it also incorporated the general conditions. The prime contract stated that, pursuant to Labor Code section 1770 et seq., Falk had to pay, and to cause any subcontractors to pay, the prevailing wage in the locality. It also stated that Falk had to keep, and to cause any subcontractors to keep, accurate payroll records showing they had paid the prevailing wage.

The prime contract stated that time was of the essence, which was particularly apt here, as the project was to be completed before the students returned from summer vacation. The specific time to complete the project, beginning to end, was to be 56 days from the date the District issued its "Notice to Proceed." This in fact issued on June 11, making the deadline August 8.

In addition to the Blackford project, the District was involved in another project to be completed that summer, at Rolling Hills school (Rolling Hills project). The general

---

[1] Galeb's position, discussed in more detail below in connection with the standard of review, is that there is no dispute as to the facts that are material to the issues here. While many facts are undisputed, many other facts are not. Thus, we set forth the evidence, "in the light most favorable to the judgment." (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 487; *San Diego Metropolitan Transportation Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528.)

contractor on the Rolling Hills project was Sausal. Falk (and apparently Sausal) went about awarding the subcontracts for the projects, which led to the relationship pertinent here.

Galeb was formed as a corporation in 1975, by Slobodan Galeb.[2] Slobodan owned 99 percent of the shares, and was president and the "responsible managing officer" of Galeb, a position he held since inception. Slobodan's son, Tomo, was vice-president, and, as will be seen, was an important actor here. Tomo's sister, Lepa Galeb-Roskopp, also worked at Galeb.[3]

Galeb submitted bids on both the Blackford and Rolling Hills projects. Tomo testified at length about how Galeb came to bid on the projects, describing how they were attractive to Galeb for "multiple reasons." The first is that Galeb did not have any "work lined up for the summer." The second was that Tomo "had a very good handle on the market and through experience what was going on with pricing." And, as he put it, "when these jobs came, I recognized in real life, because I was tracking and following the bidding that was going on, that our competitors and their crews were most likely—their best crews were most likely tied up. [¶] Well, . . . when these two jobs came, Rolling Hills and Blackford, I saw a great opportunity, one, to increase margins, two, this is a site work project. And this is what we specialize in. We're very, very good at doing site work projects. [¶] So, being that it was tailor made for us, and being that we needed work, being that it's literally, I think maybe 15, 20 minutes from my home, and my father's place of residence, it became a very attractive job for us to bid on." Galeb got both jobs.

As pertinent here, on May 20, Falk prepared a "Short Form Standard Subcontract," which short form was in fact 30 pages long. Greg Schmidt, Falk's director of operations, forwarded it to Galeb, and on May 24, Tomo signed it and returned it—but not as it had been presented to him.

---

[2] Slobodan Galeb had formed an earlier company, Galeb Company, in 1968.

[3] Since we refer to appellant as Galeb, to avoid confusion we will refer to the three members of the Galeb family by their first names. No disrespect is intended.

3

On page 21 of the subcontract, entitled "Schedule E; Scope of Work," Tomo made a handwritten interlineation, boldfaced in the quotation below, the effect of which is that Schedule E read in pertinent part as follows:

"The subcontractor shall perform all work necessary to complete the contract in a satisfactory manner in accordance with, and as defined in the contract drawings and specifications . . . . The subcontractor shall provide all labor, materials, equipment, tools and incidentals necessary to complete all of the *Demolition, Site Work and Asphalt* work. The work performed under this subcontract shall include, but not be limited to the following:

**"Scope of work clarifications as detailed in Galeb Paving, Inc. Revised Bid Proposal dated 4/28/11.**

"1. Specification Section 02 41 16—Building Demolition

"2. Specification Section 31 05 13—Soils for Earthwork. . . ." (For convenience and consistency with the briefing, we will refer to this as the Tomo subcontract.)

On June 6, Schmidt emailed Galeb: "We received your subcontract for the . . . project, unfortunately there were unauthorized modifications made to it. You added your proposal to the contract. We do not allow proposals to be included in subcontracts; there are no exceptions. We will however allow, if warranted and agreed to, that exclusions/clarifications be added to . . . the subcontract that were included in the proposal. Before we can add exclusions/clarifications to the subcontract, information needs to be provided as to where the items in question are included in the work covered by your specification section. . . . Please get back to me ASAP with further information about the exclusions/clarifications so that we can finalize your subcontract."

Schmidt apparently heard nothing, as two days later he sent Galeb another email: "[I]n the interest of time I went ahead and included your exclusions form [*sic*] your proposal to your contract. I've attached a draft copy please review and let me know if it's acceptable so I can issue a clean copy for signature."

4

Schmidt took the revised subcontract to Galeb's office, where Lepa signed it, dating it June 8. (We will refer to this as the Lepa subcontract.)[4]

The project was described by Galeb's counsel at trial as "fast track"; Falk's project superintendent Robert McCulley called it "very fast track." As described by Galeb's counsel, "fast track" meant there was "more than a usual amount of work to be performed during the time allocated." Slobodan was asked about the Blackford project, and its schedule, and admitted first that it was "complicated," because there were "many moving parts to be finished in a short period of time." It was, he also admitted, "going to be a challenging job . . . [b]ecause of the aggressive schedule and because of many moving parts . . . ."

As indicated, around the same time Galeb bid on the Blackford project, it also bid on the Rolling Hills project, and was awarded the subcontract on that job as well. Rolling Hills had the same scheduled completion date as Blackford, August 8. Slobodan was the project manager for both. He was, he admitted, the "senior most person responsible for both . . . projects."

**Galeb's "Performance" on the Project**

Selectively reading the record favorably to it, Galeb describes at length how Falk had replaced project managers, and quotes witnesses who testified, for example, that Falk's final project manager, Joseph Stam, "was difficult to work with." Maybe so.

---

[4] An issue surfaced at trial whether Lepa had authority to sign the subcontract and whether Schmidt pressured her into doing so. As to this, Galeb's version of events in its brief says this: "Slobodan was out of the country, and at the time, Lepa was transitioning out of part-time employment with Galeb; she was not an officer and was not authorized to bind it to any contract. [Citation.] Schmidt and Lepa had never met, and he never asked her whether she had any authority or if so, what it was. [Citations.] He demanded she sign his subcontract form or else he would have damages assessed against Galeb the next day. [Citations.] Because Schmidt was putting 'a lot of pressure' on Lepa and she was 'scared,' she signed Schmidt's form; Schmidt then signed the form on Falk's behalf. [Citation.]"

Falk, of course, had a different version of events, which the trial court would later determine was what in fact occurred, going on to expressly observe that "testimony by Ms. Galeb to the contrary" was not credible.

Maybe not. The fact is, it is Galeb and its performance that is the focus of the evidence relevant to this appeal. That evidence does not paint Galeb in a flattering light.

The subcontract[5] imposed numerous requirements on Galeb, including that it: attend project meetings; supply adequate manpower; submit certified payroll records; and complete its work in a timely manner. The subcontract also included a termination clause, as follows: "Should subcontractor fail to rectify any contractual deficiencies, including . . . failure to adhere to Contractor's schedule, or failure to properly carry out the work, within three (3) working days from receipt of Contractor's written notice, Contractor shall have the right to take whatever steps it deems necessary to correct said deficiencies and charge the costs thereof to Subcontractor, who shall be liable for the full cost of Contractor's corrective action, including overhead, profit and actual attorneys' fees."

The record is replete with evidence that Galeb did not meet its requirements under the subcontract in several respects. For example:

Falk held regular project meetings, at which the schedule for the project was discussed and the work coordinated. According to Douglas Williams, the construction manager for the District, the meetings were "important," to the point that he personally attended as many as he could. But they were apparently not important to Galeb, which admitted its representative attended only two: the first and the last on August 17, after Galeb was advised it was terminated. The expressed reason for Galeb's refusal to attend—however inappropriate and however in violation of the subcontract—was that Slobodan considered the meetings "ridiculous" and a "waste of time."

The District's Williams and Falk's project manager Joseph Stam both testified that Galeb did not properly staff the project. Williams, who visited both the Blackford and

---

[5] Except for Tomo's interlineations, as best we can tell both the Tomo subcontract and the Lepa subcontract were essentially identical. Indeed, Galeb's reply brief states that the Tomo subcontract was signed by him, and "another, largely identical version, was later signed by Lepa." Thus, except where relevant to the discussion, for convenience, we will usually refer to the subcontract.

6

the Rolling Hills sites regularly, was asked about crew size. He answered sometimes it was "one or none." Stam, too, testified that Galeb did not adequately staff the project, and e-mailed Galeb that he was "extremely concerned" about the lack of manpower. Indeed, the shortage of manpower continued even when the project was already late in being delivered to the District. Falk's request for more manpower was ignored, and both projects fell further behind schedule—not helped by the fact that Tomo was in Europe on an extended vacation from August 4 to August 17.

Addressing this issue in its brief, Galeb cites to Tomo's testimony that "Galeb was properly staffing the project and had arranged for additional staffing to make up for any lack." That may be what Tomo said. As indicated, there was significant testimony to the contrary. In fact, the record includes that Slobodan explained that he was required to shuttle his crew of one or two laborers or operators between the Blackford project and the Rolling Hills project. The record also includes dramatic testimony from Brian Adams, Falk's superintendent of construction, who was asked if Slobodan ever came "to him with any complaints about whether he could finish both the Blackford job and the Rolling Hills job." This was Adams's response and the colloquy that followed:

"A: I can recall at least one occasion, probably two occasions, that we sat down on the curb together and we just talked man to man, like, you know, how things are going. He was under a lot of stress. He was tired because he's a hard worker and he was under a lot of stress at that time trying to do two jobs, and he wasn't sure if he was going to be able to pull it off."

"To be honest with you, I felt really bad for the man. He was sincere and he's passionate about his work. To be honest with you, he broke down crying to me that day.

"Q: And what did he tell you about whether he could finish the work or not?

"A: He didn't think he was—he was under a lot of stress. He didn't feel like he might not be able to finish both of those projects. At least at that point he was on his own.

"Q: And he broke down and cried?

"A: Yes."

7

On August 8, Falk issued a "three day" notice to Galeb to "return" to the site and "commence" performing certain work, and on August 14, Falk issued a recovery plan. Meanwhile, by early August, Falk had brought in Patriot Engineering to supplement Galeb's work at Blackford. Similarly, another contractor was brought in to supplement Galeb's work on the Rolling Hills project, because Sausal, the general contractor there, concluded that Galeb was not keeping up with its work on that project either.

In addition to the above, there was evidence that Galeb did not provide the certified records called for by the subcontract—not to mention required by statute. Because the parties devote much of their briefing to the "certified payroll record" issue, we digress briefly to discuss the significance of the prevailing wage law, which we had occasion to address in *State Building and Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 294-295, where we explained as follows:

"California's prevailing wage law (§§ 1720–1861) traces back to 1931, the same year Congress enacted the federal counterpart, commonly known as the Davis-Bacon Act. (Stats. 1931, ch. 397, p. 910; 46 Stat. 1494, as amended, codified at 40 U.S.C. §§ 3141–3148.) Prevailing wage laws were enacted in response to the economic conditions of the Depression, when the oversupply of labor was exploited by unscrupulous contractors to win government contracts when private construction virtually stopped. (See *Universities Research Assn. v. Coutu* (1981) 450 U.S. 754, 774.)

"The Legislature has declared that it is the policy of California 'to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.' (§ 90.5, subd. (a).) 'This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to

8

compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees.' (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.)  [¶] . . . [¶]

"A contractor or subcontractor who pays less than the established prevailing rate may be assessed civil penalties (§§ 1741, 1775, 1777.7), may be suspended from bidding or working on public works projects for up to three years (§§ 1777.1, 1777.7), and is also subject to criminal prosecution for failing to maintain payroll records demonstrating compliance (§§ 1776, 1777)."

In sum, there was evidence that in at least four particulars, Galeb was failing to meet its contractual requirements under the subcontract.  This is bad enough.  Perhaps worse is the evidence of Galeb's affirmative wrongdoing.  Three illustrations should suffice.

First was the evidence that Galeb purposely placed its equipment so as to hinder other subcontractors from doing their job.  For example, the District's manager Williams testified that Galeb parked its equipment so as to block other contractors from doing their jobs, specifically, delaying landscaping work, other paving work, fencing, and the installation of playground equipment.  And, Williams said, it appeared what Galeb did was "intentional."

Second was the evidence that Galeb took valuable copper wire that belonged to the District, and which, according to the subcontract, was to be left for the District.  Stam was on the site when the incident occurred, and talked to a Galeb employee about it.  As Stam tells it, he saw a regular pickup truck "full" of copper, and he told a Galeb employee that the copper should not be removed from the site.  The employee refused, telling Stam that he was "under the direction of . . . [Slobodan]."  Falk followed up with conversations and e-mails.  To no avail.  Galeb flat out refused to return the copper wire and, indeed, sold it and kept the proceeds.  The District viewed this as "theft."

Third was the evidence of Slobodan's August 17 assault on Falk's project superintendent Stam.  While Galeb has one version of what occurred—a version with which it begins its lengthy discussion of the incident in its brief—Stam had a much

different version, including that the day began with him questioning Slobodan, to confirm Galeb would be "traversing back and forth" between the two projects. It was, as Stam described it, not "a productive conversation." And then came the altercation.

Slobodan, who was described by a former Galeb worker as having a "temper," put his forearm to Stam's neck, having at some earlier point told Stam he had been a professional boxer and that "one punch, [you] never wake up." Slobodan then picked up a rock, threw it on the ground, and said something along the lines that that "could be your head or your face." And then Slobodan spit in Stam's face—for the second time. Stam described how Slobodan then picked up some wire mesh which has sharp edges when it is cut, and apparently brandished it. Stam viewed this as a weapon, and at that point decided to walk away.

Stam reported the incident to Schmidt, and eventually the police came and instructed Slobodan to leave the site. He did not, but got back on the equipment, until he was asked again, either by the police or the District, to leave, at which point he did.

In sum, despite Galeb's attempts to downplay the incident, even its brief admits that "there was no dispute that Slobodan (1) picked up and threw away the piece of concrete; (2) commented that he had been a boxer when young and could 'squash' Stam's head; (3) spat in Stam's face; (4) was asked to and did leave the site; and (5) was advised that he would be arrested if he returned without permission."

As noted, Galeb was terminated that day, via a letter from Schmidt to Slobodan that read in pertinent part as follows:

"As you are aware yesterday you failed to perform as promised the day before and documented in my letter to you. Today there were many attempts to further block the other contractor that is assisting on site. As you are aware your demeanor continued to decline as the day went on. This afternoon you threatened to run over the workers of the other grading contractor that we brought on site. You also threatened that if the other grader was still on site tomorrow morning you would move your equipment to locations to block access to the entire site.

10

"Later in the afternoon (at approximately 3:25) you got into an unprovoked incident with one of DLF's employees, Joe Stam, actually spitting in his face twice and picking up a large rock moving toward him and threatening to bash his head in. During this incident you actually forced your fore arm against Joe's throat in a threatening manner. As a result of this incident the San Jose Police were called to come out and made a report (case # 11-229-0562).

"Please consider this letter official notice of termination of Galeb Paving, Inc's subcontract on the Blackford Project. The termination is based on your failure to perform after being issued a 3-day notice and also as a result of your threats made not only to Joe Stam but also toward several other workers on the project. Your company has been banned from the site by the School District and you have been advised that if you return to the site you will be arrested for trespassing, you have been granted access tomorrow morning at 7:30 a.m. to retrieve your equipment. If you fail to show-up or cannot retrieve all of your equipment tomorrow morning you will need to obtain pre-approval to return to the site to avoid arrest.

"Sufficient funds on the project will be withheld as required to cover 1 1/2 times the cost of the remaining work. When all of the work associated with Galeb's subcontract is completed a full accounting of all costs associated with completing the scope in Galeb's subcontract will be provided and any remaining funds will be released to Galeb."

## PROCEDURAL BACKGROUND

### The Complaint

On March 12, 2012, Galeb filed a complaint against Falk and Liberty Mutual. The complaint alleged four causes of action: (1) breach of contract; (2) common count; (3) waiting time penalties; and (4) action on payment bond. The first three causes of action were against Falk, the fourth against Liberty Mutual. The first cause of action referred to a "written subcontract," and attached as Exhibit A to the complaint the Tomo subcontract, the one unsigned by Falk.

11

On May 9, 2012, Falk filed its answer. It included numerous affirmative defenses, including that "[Galeb's] claims are barred in whole or in part by [Galeb's] failure to perform the conditions precedent, covenants, and/or promises required on their part to be performed pursuant to the conditions and terms of the parties' agreement(s)." Liberty Mutual filed a similar answer.

**The Trial**

On April 26, 2013, the case proceeded to a nonjury trial, before the Honorable George Hernandez, a most experienced trial judge. Following a few preliminaries, Galeb's counsel made his opening statement, which included his description of Galeb's position—and what would be seen as a surprising approach to its case. The description was as follows:

"The contract form was sent to Galeb Paving which Tomo Galeb had some problems with, so he made some handwritten changes to it, signed it, sent it back.

D.L. Falk then responded to that by saying, 'The changes are fine, but we don't want to have handwritten changes. It is a matter of policy for this company.'

"So, what eventually happened was an amended contract form was prepared, and our evidence will show, hand delivered to Galeb Paving and presented to the person who was in the office at that point. She did not have authority to sign this contract, but she did. Here we are.

"It will be the Plaintiff's contention in this case, your Honor, that in light of the fact that D.L. Falk did not sign the contract form which was signed by an officer of the company, and the only signed contract was signed [by] somebody who did not have authority, and in fact, the evidence will show that certain representations made to her about the content of the revised subcontract form were false, that we don't have a written subcontract in this case.

"What we have is a job being performed by a subcontractor based upon plans, specifications and what the evidence will show was the revised bid submitted by the bidder, Galeb Paving, to D.L. Falk, upon which Galeb was instructed to perform the work."

As will be seen, Galeb's approach would cause much discussion—and consternation.

The very next day, the court expressed its desire to have some questions answered that "perhaps can help [it] organize [its] approach." After confirming that Falk had filed a trial brief but Galeb had not, the court said, "Then, I have a question. And the question is, is there a contract between" Galeb and Falk. This led to the following lengthy discussion:

"MR. McKIM [Counsel for Galeb]: That's a matter of dispute.

"THE COURT: I don't know. I don't know what your position is on that. I see that from the defendant's point of view, they said that there is a contract. Then of course the Court in the valuation will be reading the contract and enforcing the contract terms.

"If there is no contract, then you don't necessarily use those contract or contract terms, you use the value of services rendered. [¶] So I don't know what the position of the Plaintiff yet is because my analysis of everything that occurs will be based upon whether or not I am looking to the contract and asking what it is that the parties did consistent with or against the contract. [¶] Or whether or not there was no contract, and then I would look at the conduct. And based upon the conduct, I would determine what the reasonable value of the services rendered was.

"So, without a trial brief, maybe you can give me some guidance, because I'm listening and I'm taking the notes and I understand so far the experiences that have been expressed to me by Mr. Galeb, but I need to know in the context of how I will be deciding this, interpreting the terms of the contract? Or quantum meruit matter.

"MR. McKIM: It is the plaintiff's position that there is not a written subcontract agreement that was a result of a meeting of the minds between the parties.

"THE COURT: Okay.

"MR. McKIM: And as I guess I didn't indicate clearly yesterday in my opening statement, Tomo Galeb signed one contract but modified it.

"THE COURT: I understood the sequencing of it.

13

"MR. McKIM:  Then there was a second contract form that was sent over to Galeb Paving.

"THE COURT:  Signed by somebody without authority.

"MR. McKIM:  Signed by somebody without authority.  And based upon statements made that—concerning the content of the document, which were not necessarily true.

"THE COURT:  Therefore—

"MR. McKIM:  So therefore, it's our position that this is a—the work that was done by Galeb Paving was done pursuant to plans, specifications and the revised bid and it would be a quantum meruit case but for the fact of the bid.

"It is essentially a contract that is expressed in written terms as opposed to having a written contract and the written terms would be the plans, specifications and revised bid.

"THE COURT:  So it is not all the terms.

"MR. McKIM:  No.  No.  But I think those are the essential terms.

"THE COURT:  So it's the terms that you want.

"MR. McKIM:  Yes.

"THE COURT:  And not the terms you don't want.

"MR. McKIM:  Well, we get the terms whatever they were, your Honor.

"THE COURT:  No, I'm just trying to figure out what the theory is, because as you can probably expect, or appreciate, the Court spends a bit of time dealing with contracts and contract disputes and a great deal of time dealing with construction contracts and contract disputes.  [¶] . . . [¶]

"So, I just need to know when I finally start making decisions, whether or not I will be following a contract.  [¶] . . . [¶]

"I just need to know for purposes of my decision, if it is a position that there was no contract, then that puts me into a certain view.

"And if it is the position that yes, there is a contract, however, it puts me in a different view.

14

"MR. McKIM: It is the Plaintiff's position that there is a contract expressed in writing, but the writing is not the subcontract agreement form prepared by D.L. Falk. The written contract is expressed in the plans, specifications, revised bid and change orders that we haven't gotten to, additional work authorizations, which supplement the original working documents.

"THE COURT: Okay. So, let's say, for example, that it is the position of the Plaintiff that the contracts are the limited documents that you expressed.

"Will there be evidence that the Defendant signed that written document?

"MR. McKIM: No. There was no—there was—there was nothing to sign in regard to that.

"But there was, I think, acceptance by action as opposed to acceptance by signature.

"THE COURT: Okay. So, for example, there wasn't something like we're unwilling to sign the original contract, and we didn't sign the original contract.

"Instead we are—we have—we agree to do these specific things, and there's something like an e-mail saying, 'Okay. Then those specific things are fine.' Or—I don't know—I'm trying to find out if it's not the contract that's written. And if it's not the quantum meruit exclusively, your suggestion is that it is another contract that was created by some information, no doubt given to the Defendant, about what those contract terms are. And then the Defendant agreed . . . ."

Following more colloquy, the discussion on the issue ended with this:

"THE COURT: Okay.

"MR. McKIM: When I'm talking about supplementation, I'm talking about additions and deletions that come later through the change order process.

"THE COURT: Let's hold off on the change orders for a minute because every contract for construction has change orders. That's just the way the world really works.

"What I'm trying to understand is whether or not the—holding off on the change orders for a minute, whether the agreement that the Plaintiff is hoping to enforce has the

15

same value as the written contract that is suggested by—that existed by the interpretation of the Defendant.

"MR. McKIM:  If by 'value,' you mean agreement as to the price to be paid—

"THE COURT:  Yes.

"MR. McKIM:  —for the work, then the answer is yes, they're identical.

"THE COURT:  Okay.  So, you understand that the contract had more things connected to it than the contract that you're hoping to enforce.

"MR. McKIM:  The written subcontract form includes standard clauses that D.L. Falk uses that are not a part of the agreement set forth in writing that we are trying to enforce.

"THE COURT:  I'm thinking about attorneys fees for example.

"MR. McKIM:  Attorneys fees is one issue.

"THE COURT:  That's a big deal because the big contract, the one suggested by the Defendant, has all sorts of things, including attorneys fees in it.  And you're—the amount you're suggesting is smaller, in terms of the rights and obligations, but it has the same value and it wouldn't include attorneys fees.

"MR. McKIM:  To the extent the specifications provide for attorneys fees, it would.

"And we also make the claim for attorneys fees under the payment bond claim.

"THE COURT:  Let's hold off on the payment bond.

"I understand when it comes to attorneys fees there has to be a written agreement between the parties, by statute, agreeing to the attorneys fees.  And I understand the position of the Plaintiff, you don't have a written contract.  We have a contract that is, as you've expressed, by the terms and rights of the—that part wouldn't have attorneys fees.

"MR. McKIM:  Plaintiff understands that by going down this path, there is a risk that your Honor will find that the agreement under which the work was performed does not include an enforceable attorneys fees provision.

"We acknowledge what you're saying.

16

"THE COURT: Okay. So, that goes back to my very—again, this is all looking at my notes and trying to understand this.

"If the entire contract is valued at 'X,' and your suggestion that the contract—that the agreement by which you performed is smaller and doesn't include all the terms, but it is still equal to X, so there will be some evidence, I will assume, that the work done by the plaintiff under this agreement will show that its value is equal to the contract, entire contract. Meaning—do you understand where I'm struggling?

"MR. McKIM: I think I do. And I—we're not—we are contending there was an agreement as to the scope of work and the price. So it's not our position that this is a quantum meruit case.

"There is an agreement.

"THE COURT: We're all in agreement.

"MR. McKIM: No, no, it's an agreement expressed in writing and the acceptance of the parties to the extent necessary is embodied to forms. Number one, the price was agreed to because the bid was accepted by Falk. And then Falk instructed that the work be done.

"THE COURT: See, I see the price attached to the entire contract. That's the problem.

"You see because contract—a contract has a price to it. And in it there are all sorts of other things, including the scope of work. That's why I was holding as an exhibit, you know, what the contract is.

"The entire contract worth $5 million for example. So, if you start taking out little parts of it, then you no longer have an entire contract worth $5 million.

"I think that part of the attorneys fees clause is a bargained-for condition of a contract, for example.

"So that's why when I see it come a little smaller, I need to know how you're going to be doing that.

17

"MR. McKIM: I think we can cut to the chase here that because there was an early termination of the contract, we will be putting in evidence the reasonable value of the work up to that point in time anyway.

"So we're not looking at the—this is not a simple case where the work was performed and we're suing for the contract price.

"THE COURT: Right. Right.

"MR. McKIM: So we are suing for the reasonable value of the work that was done up to a certain point.

"THE COURT: Okay. So there is no contract.

"We're going back to my first question, no—you know, whether or not there was—I mean you're suggesting that it certainly isn't what was allegedly signed by the defendant—by the person without authorization. That's certainly not the contract.

"MR. McKIM: That's our position.

"THE COURT: It is something else. Something else is going to be determined by showing what the—what the Plaintiff agreed to do and for how much money; right?

"MR. McKIM: Yes.

"THE COURT: And so to the extent that what the Plaintiff agreed to do and for how much money, you're seeking to recover that.

"MR. McKIM: We're not seeking to recover the full amount of the price that was agreed to by the parties, because the plaintiff did not perform all that was supposed to be performed.

"So what we're looking for from your Honor ultimately in this case is an award of the value of the work that was done.

"THE COURT: Okay.

"MR. McKIM: And the profit on the work that was not done.

"THE COURT: Pursuant to the contract.

"MR. McKIM: Pursuant to law.

"THE COURT: No, the work that was not done pursuant to the contract.

18

"MR. McKIM:  The work that was included in the scope of the contract but was not done because they were terminated."

Trial proceeded for two more days, which included testimony from Tomo and Reba, who had signed what they had signed.  Then, on the morning of May 2, the fifth day of trial, counsel for Galeb began by advising the court that before resuming the testimony, Galeb "would like to present a proposed amended complaint."

The record reflects some 25 pages of discussion of just what it was that the proposed amendment would accomplish, at the conclusion of which the court continued the matter so that Falk and Liberty Mutual could address it.  The next day, Falk and Liberty Mutual filed opposition, and on May 6, the next court day, the court heard argument on Galeb's motion to amend.  And denied it.

Referring to that denial, a footnote in Galeb's brief intimates that the denial was with prejudice.[6]  This is a less than candid reading of the record, which is this.

On May 15, Galeb rested.  At that point, the court said it would take a short break and then would hear from Falk.  Immediately following that break, the court began with this observation:

"THE COURT:  We'll take another break, but I just wanted to make the record clear.  During the course of this trial, the plaintiff made a motion to amend the Complaint that the Court denied.  That did not prevent the plaintiff at some point at the end of their case to still attempt to amend their Complaint according to proof.  I didn't want you left with the opinion that because the Court did not permit the amendment of the Complaint, that doesn't somehow prevent you, now that your case is over, to seek an opportunity to

---

[6] The footnote reads as follows:  "In its later statement of decision, the court stated that it had denied Galeb's motion 'without prejudice to Galeb's right to move for leave to amend to conform to proof at the close of its case.'  [Citation.]  But earlier, in ruling on Galeb's motion to amend, the court stated that it would 'not be adding or subtracting anything from the original Complaint that started this trial,' and denied the motion 'on all of the terms proposed by the defendant.'  [Citation.]  Those terms included defendants' request that the motion be denied *with* prejudice.  [Citation.]  The court did not deny the motion 'without prejudice,' must less state or imply that Galeb could later more for leave to amend to conform to proof."

19

amend to conform to the proof that existed that came through. [¶] I just wanted to make that clear before we went any further because I didn't know whether you were going to do anything like that. Do you want to think about that or do you want to go forward?

"MR. McKIM: I would like to make a motion to amend to conform to proof along the same lines, the same amended Complaint—

"THE COURT: I would suggest that you not do that. This is the problem. The problem is I didn't want you to somehow think that in fact because I made a decision that was about the pleadings then, that somehow it prevented you from making a motion to amend conforming to the proof. That's all—that's the only thing I wanted to do. I didn't want you to then think was going to happen, that you were prevented from doing that. Okay?

"MR. McKIM: Okay.

"THE COURT: What I am going to do then is I'm going to give you time for a break. As you rested, then the defendant has an opportunity to make a motion at this point and before that occurs, I was going to give you the opportunity, if you wanted to, to think about whether or not you want to conform to proof. I want to keep that clear because I may not have been so clear before.

"MR. McKIM: Okay.

"THE COURT: Anything else?

"MR. McKIM: No.

"THE COURT: Okay."

Following a short recess, the trial resumed with this:

"THE COURT: Okay. Now that you have rested, Mr. McKim, do you have anything else you wish to address the Court with?

"MR. McKIM: Yes, your Honor. Plaintiff would make an oral motion at this point for leave to amend to conform to proof.

"THE COURT: What is the proof and what cause of action do you hope to create by the proof that has been established?

"MR. McKIM: The proof consists of the following:

20

"There was a form of draft contract that was sent to Galeb Paving by—let me back up.

"First, there was a revised bid proposal that went in that set forth the terms under which Galeb was proposing to do its work. The evidence shows that bid was received. It was used by Falk in presenting its bid to the District, that the District accepted Falk's bid and Falk noticed—

"THE COURT: I don't need an argument.

"MR. McKIM: Okay.

"THE COURT: This is the way I understand amending a Complaint according to proof is. It is referring to something specific that was said by someone, some proof, and then as a result of that proof therefore it shows this element. I don't want argument because it is limited to the proof that was submitted to the Court. So I need this and this and this and this and therefore this.

"MR. McKIM: What we would seek to amend, your Honor, is, number one, first cause of action. Based upon Exhibit 7 in evidence, which is Mr. Schmidt's e-mail, in which he said in the interest—I'm paraphrasing, but in the interest of speed, I have included all of your provisions in the contract form that Tomo had signed. He then sent that e-mail back. It is the plaintiff's position that that, as your Honor's well aware a contract acceptance is based upon objective terms not subjective meaning. It is plaintiff's position that Mr. Schmidt's e-mail saying that I have adopted your terms, is objectively an acceptance of the terms of the contract agreement that Mr. Tomo Galeb had signed and returned. [¶] So we would seek to amend the first cause of action along the lines that we sought to amend the Complaint at the inception of trial to allege the circumstances under which a contract was formed, which is the same contract we had filed the original Complaint on, but elaborating with regard to how that contract was formed.

"Secondly, your Honor, we would seek to amend to conform to proof based upon the testimony of Lepa Roskopp and Tomo Galeb that the signature that Lepa placed upon the other contract form, which was signed by Falk, was done under her mistaken belief

21

that the terms that her brother had worked out with Falk had actually been faithfully incorporated into the form that she signed.

"THE COURT: She said that?

"MR. McKIM: Yes, she said that. Yes, she was relying upon her brother having taken care of that and the e-mail from Mr. Schmidt saying I have included your terms. We would seek to add a cause of action in the event that the Court would define that there is no acceptance, no formation of a contract in a form signed by Tomo, that the contract form that was signed by Lepa should be reformed to state the parties' true agreement as expressed in the parties' confirming memoranda, which would be the contract form that Tomo signed and the e-mail back from Mr. Schmidt.

"THE COURT: Okay. Anything else?

"MR. McKIM: No, your Honor.

"THE COURT: Response to this—this is, again, this is a very narrow opportunity and that is that the evidence that the Court has heard and that you have rested on, the admissible evidence, is such that another way of looking at the testimony creates this cause of action that is not a new cause of action but another legal theory supported by the evidence.

"MR. McKIM: Correct.

"THE COURT: Okay. Go ahead, Counsel."

Counsel for Falk and Liberty Mutual then responded, beginning with the contention that what he "just heard was a repeat of the motion for leave to amend which was denied previously," and concluded that "it's inappropriate to grant leave to amend to conform to proof at this late date on the same basis that it was already denied . . . ."

The court then responded:

"THE COURT: That's why I did this first. I needed to know the Complaint that we are moving forward on is what it is. I believe there was [a motion] to adjust it earlier and now the evidence is all in, then an opportunity to adjust it one last time before the Court turns it over to the defense.

22

"Okay. So if the Court were to amend the Complaint, then how would the Court—what sort of amendment are you seeking? I heard the words, but we have—but it wasn't clear to me how is it that the words that I have heard in terms of admissible evidence produces another recoverable theory, another actionable theory? That would be something that the Court could consider given, first of all the Complaint that you created and everyone participated in discovery, and also the affirmative defenses. What specifically would you like it to say?

"MR. McKIM: I would like it to be amended specifically along the lines of the proposed amended complaint that was submitted previously.

"THE COURT: Okay. Anything else?

"MR. McKIM: No.

"THE COURT: If that's what it is, I can't do it. I'm sorry. I can't amend the Complaint. The information that the Court needs is new information, something that came out as a result of the trial, the evidence, that would support a theory that is with sort of a within an extension of the main theory that is part of the Complaint. The Complaint sounds in a breach of contract.

"Since it sounds in a breach of contract and a contract is, as it is, the suggestion that the contract be entirely reformed, as you're suggesting, and the suggestion of the reasons that the reformation is appropriate or your suggestion that, although the contract as pled, that the contract really wasn't the contract that you indicated because a signature lacked authority, that's what we heard before. The information that you have given me now hasn't changed it.

"So the motion to amend the Complaint, in the way that you have suggested based upon the evidence that was submitted, is denied. Then you rest."

**The Motion for Judgment**

Following the denial of Galeb's motion, the court turned to Falk's counsel, who began as follows: "Your Honor, we would at this point make a motion for judgment based on Code of Civil Procedure 631.8 for the reasons I articulated," and began to describe those reasons. The court interrupted, and said the better procedure would be to

23

"file your motion and then reconvene tomorrow so you will have an opportunity to review not only what the evidence is and also the objections as presented and then we can just reconvene tomorrow morning and have the hearing on the 631.8 motion."

Following that, Falk and Liberty Mutual filed a written brief in support of the motion for judgment. Galeb filed written opposition, which, not incidentally, did not request that it be permitted to reopen its case to present additional evidence. On May 16, the court heard argument on the motion for judgment, following which it granted it.

**The Statement of Decision**

On May 20, Galeb requested a statement of decision. On June 17, Falk and Liberty Mutual filed their proposed statement of decision. On July 2, Galeb filed objections to the proposed statement of decision and asked for a hearing.[7]

On July 5, without holding a hearing,[8] the trial court issued its comprehensive 10-page statement of decision. The statement of decision begins with the discussion of the breach of contract claim, and as pertinent here described the "contract formation." Then, reciting that the "only fully executed agreement between the parties" was the Lepa subcontract, the statement recited that "Galeb sued on a purported written agreement signed by Galeb, but not by D.L. Falk. Trial Ex. 6. Neither Trial Exhibit 6, which on its face was unsigned by D.L. Falk, nor extrinsic evidence—including testimony and documentary evidence that Greg Schmidt, D.L. Falk's Director of Operations, refused to accept Galeb's handwritten amendments (which, among other things, incorporated by reference Galeb's bid proposal)—indicate that D.L. Falk accepted Trial Exhibit 6.

---

[7] Galeb's brief asserts that in its objections Galeb requested leave to amend to assert the Lepa subcontract as the parties' agreement, and that the trial court ignored this request. In fact, Galeb's opposition made only the following conditional argument: "If the Court believes that the only valid contract is that which Lepa Galeb signed—*a proposition with which Galeb disagrees*—then Galeb should be afforded an opportunity to amend to conform to proof." (Italics added.)

[8] There is no requirement that a court hold a hearing to settle a statement of decision. (Cal. Rules of Court, rule 3.1590(k) [court "may order a hearing"].)

24

[Galeb Request No. 1.]  The purported written agreement upon which Galeb sued was a counteroffer."  (Fn. omitted.)

The statement of decision went on to discuss Lepa's authority to sign on behalf of Galeb, and then said this:

"D.  Contract Terms

"The Subcontract includes, among other material terms, an integration clause: 'This Agreement represents the entire agreement between the Contractor and the Subcontractor and supersedes any prior written or oral representations."  Trial Ex. 402, Subcontract, sec. 3.  It also includes a termination clause:

> "Should Subcontractor fail to rectify any contractual deficiencies, including failure to pay its creditors, failure to adhere to Contractor's schedule, or failure to properly carry out the work, within three (3) working days from receipt of Contractor's written notice, Contractor shall have the right to take whatever steps it deems necessary to correct said deficiencies and charge the costs thereof to Subcontractor, who shall be liable for the full cost of Contractor's corrective action, including overhead, profit, and actual attorneys' fees.

"Trial Ex. 402, Subcontract, sec. 10(i).  In addition, the Subcontract required Galeb to:

"—timely complete its scope of work (Trial Ex. 402, Subcontract, secs. 4, 10, Schedule E (Scope of Work), ¶¶ 16, 23);

"— supply adequate manpower to the Project (Trial Ex. 402, Subcontract, Schedule E (Scope of Work), ¶ 23);

"—attend Project meetings (Trial Ex. 402, Subcontract, Schedule E (Scope of Work), ¶¶ 16, 18, 19); and

"—submit certified payroll records (Trial Ex. 402, Subcontract, Schedule C. (Invoice Requirements), ¶¶6, 11; Schedule D (Labor Law Compliance)).

"The evidence in the record indicates that Galeb had failed to perform contractual requirements at the time of its termination.  Most critically for the purposes of deciding the Motion, Galeb introduced no evidence that it submitted certified payroll records to D.L. Falk for the Project, which was an absolute condition precedent to its receiving payment for its work."

25

"E.    Failure to Satisfy Condition Precedent

"Galeb had the burden of proving that all conditions required by the contract for Falk's performance had occurred or were excused, CACI No. 303; *Consol. World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380 ('where defendant's duty to perform under the contract is conditioned on the happening of some event, the plaintiff must prove the event transpired.')  Galeb did not satisfy this burden at trial."

The statement of decision went on to discuss Galeb's failure to submit certified payroll records,[9] and then summed up:

"F.    Galeb's Breach of Contract Cause of Action Fails

"Galeb neither pleaded or proved the existence of a valid contract—the first element in a breach of contract cause of action.  Galeb also asserted during trial that any number of other writings, or none at all, formed the parties' contract.  Galeb cannot gain all the benefit of the Subcontract's price without the burden of any of its requirements— including its certified payroll requirement and termination provisions.  Instead, it failed to sue on the actual, valid, fully executed, and enforceable Subcontract—Trial Exhibit 402.  Even if Galeb had sued on the Subcontract, Galeb introduced no evidence that it submitted certified payroll records to D.L. Falk for the Project, which was an absolute condition precedent to its receiving payment for its work under the Subcontract.  Thus, Galeb was not entitled to payment for any of its work on the Project, including with

---

[9] "1.  Galeb's Failure to Submitting [*sic*] Certified Payroll Is Dispositive

"Galeb had a contractual duty to submit certified payroll records, which was a condition precedent to its being paid on the Project at all.  Trial Ex. 402, Subcontract, Schedule C (Invoice Requirement), ¶¶6, 11 ('Subcontractor understands that progress payments will not be released until accurate certified payroll reports have been supplied for the period"); Subcontract Schedule D (Labor Law Compliance); [Galeb Request No. 5.]  Galeb presented no evidence demonstrating that the certified payroll condition precedent had been satisfied.  In fact, there was substantial evidence to the contrary.  Therefore, the condition precedent was not satisfied, and Galeb's contract cause of action is precluded."

26

respect to Change Orders 1, 2, 3, 6, 7, or 8, or for the work reflected in Trial Exhibits 22, 23, 24, 27, 29, 30, 62, 63, 67, and 79. [Galeb Request Nos, 9-10.]

"Galeb's breach of contract cause of action fails for each of the reasons discussed above, and judgment for D.L. Falk and against Galeb on Galeb's first cause of action is required."

The statement of decision then went on to rule against Galeb on the other three causes of action.

**The Judgments**

On the same day it filed the statement of decision, the trial court entered judgment, which recites that the court "finds that Plaintiff Galeb . . . has been unable to meet its burden in its entirety and is therefore unable to proceed with its case as to each of Galeb's causes of action." On August 13, Galeb filed its appeal from that judgment.

Falk moved for attorney fees and costs as the prevailing party under the Lepa subcontract. Galeb filed opposition and Falk a reply. Following a hearing, the court granted Falk's motion, and awarded $295,509.07. The court then entered an amended judgment incorporating the award, from which Galeb also appealed.

We consolidated the appeals on the parties' joint motion.

## DISCUSSION

### The Motion for Judgment and the Standard of Review

Code of Civil Procedure section 631.8 provides that a party may move for judgment in its favor after the opposing party has completed presentation of evidence in a nonjury trial. The judge, sitting as trier of fact, may weigh the evidence and order judgment in favor of the moving party. The motion is not limited to the legal sufficiency of the opposing party's evidence (i.e., whether there is evidence of each essential element of the opposing party's claim or defense). Rather, the motion empowers the judge to decide issues of credibility and preponderance of evidence. (Code Civ. Proc., § 631.8, subd. (a).)

The purpose of Code of Civil Procedure section 631.8 is " ' " 'to dispense with the need for the defendant to produce evidence' " ' where the court is persuaded that the

27

plaintiff has failed to sustain its burden of proof. [Citation.] Because the trial court evaluates the evidence as a trier of fact, it may refuse to believe some witnesses while crediting the testimony of others." (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1262-1263.)

Galeb argues that such judgment was improperly granted here, an argument it makes as to all four causes of action. Thus, Galeb argues first that "The Trial Court Erred By Concluding That Galeb Breached The Subcontract Since Its Failure To Submit Certified Payroll Records Was Excused By Falk's Failure To Advise Galeb Of The Omission," an argument premised on the assertion that the "sole basis for finding Galeb breached the subcontract was Galeb's failure to submit certified payroll records." Galeb's reading of the record is misplaced—as is its claimed standard of review.

Premised on its "sole basis" argument, Galeb asserts that the court's finding is reviewed "de novo because the essential facts are undisputed."[10] Falk contends otherwise, and that the usual rule on review of section 631.8 motions pertains here, that we review the evidence in the light most favorable to the judgment, bound by the trial court's findings that are supported by substantial evidence. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc., supra,* 73 Cal.App.4th at p. 528.)

---

[10] As Galeb sums it up in its reply brief: "While *some* factual issues were disputed, the factual issues relevant to the legal issues raised in this appeal were not. . . . [¶] . . . [¶] Defendants finally argue that Galeb is wrong in stating that the trial court's application of the law to undisputed facts is reviewed de novo, [citation], and that, in any event, facts were indeed disputed. [Citation.] [¶] Defendant's first point is wrong. The '*application of law* to *undisputed* facts is subject to the appellate court's independent review.' Jon B. Eisenberg et al., *California Practice Guide: Civil Appeals and Writs*, Scope And Limits of Appellate Review ¶ 8:114 (Westlaw 2013) (orig. ital.). And defendants' second point proves inconsequential. Here, Galeb has not challenged the trial court's resolution of the disputed facts, because only the court's application of the law to the *undisputed* facts is at issue—and this Court reviews that 'application' independently. Tellingly, defendants do not claim that the facts Galeb said were undisputed were disputed."

We conclude that Galeb's reading of the record is improper, its argument is therefore fundamentally flawed, and the trial court's ruling on the motion was correct. On all four causes of action.

**Galeb's Breach of Contract Claim Was Properly Rejected**

As indicated, Galeb's position is premised on the assertion that the "sole basis" of the decision was Galeb's failure to submit certified payroll records. While, as quoted, the trial court described the failure to provide certified payroll records as "most critically," and at another point "dispositive" on Galeb's failure to demonstrate that it met all conditions precedent, such failure was not the "sole basis" for the court's decision.

To the contrary, the statement of decision bears repeating here: "F. Galeb's Breach of Contract Cause of Action Fails [¶] Galeb neither pleaded or proved the existence of a valid contract—the first element in a breach of contract cause of action. Galeb also asserted during trial that any number of other writings, or none at all, formed the parties' contract. Galeb cannot gain all the benefit of the Subcontract's price without the burden of any of its requirements—including its certified payroll requirement and termination provisions. Instead, it failed to sue on the actual, valid, fully executed, and enforceable Subcontract—Trial Exhibit 402. Even if Galeb had sued on the Subcontract, Galeb introduced no evidence that it submitted certified payroll records . . . ." In short, the court held that Galeb failed to meet its burden. As indeed it did.

In order to prevail on a claim for breach of contract, Galeb had to show four requisites: (1) a contract; (2) its performance or excuse for non-performance; (3) breach; and (4) damages. (*Acoustics, Inc. v. Trepte Construction Co.* (1971) 14 Cal.App.3d 887, 913; CACI 303.) As the trial court noted, the contract Galeb proceeded on was not a contract at all, as it was not signed by Falk. Galeb "neither pleaded nor proved the existence of a valid contract, the first element in a breach of contract cause of action."

"Where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and

29

weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466; accord, *Los Angeles County Department of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967.)

The Supreme Court described the same principle some 70 years ago, in *Roesch v. DeMota* (1944) 24 Cal.2d 563, observing as follows: "In substance the trial court found and concluded that the plaintiffs and those equally charged with them in sustaining the burden had not proved payment by a preponderance of evidence. The problem here is not whether the appellants on the issue of payment failed to prove their case by a preponderance of the evidence. That was a question for the trial court and it was resolved against them. The question for this court to determine is whether the evidence compelled the trial court to find in their favor on that issue." (*Id.* at pp. 570–571; see generally, Eisenberg, *supra*, §§ 8.76.5, p. 8-39.) Galeb cannot make such showing here.

Beyond that, there is all the evidence discussed above, demonstrating that Galeb did not perform its obligations, even under the Tomo subcontract. Thus, Galeb would fail to meet the second requisite of a breach of contract claim.

And beyond all that, the evidence would support that Falk terminated Galeb for cause, as illustrated by *Associated Lathing & Plastering Co. v. Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 49–50, which affirmed a judgment for the general contractor who had terminated the subcontractor. As Justice Peters there wrote for our colleagues in Division One: "Respondent, as general contractor, was required to coordinate the work of all the subcontractors. He was entitled to the cooperation of all subcontractors. Instead, in violation of this responsibility, appellant harassed and embarrassed respondent by failing to give the requested information. If a shortage of materials had developed, which was possible, such failure would have had most serious results. Respondent had the duty of guarding the construction from such a danger, and was entitled to the cooperation of all subcontractors in the performance of this duty. This was essential to the satisfactory completion of the contract. This cooperation it did not receive from appellant. This was a serious breach of duty. The fact that severe damages did not result

30

from the breach bears only on the quantum of liability.  [¶] Appellant next contends that the three breaches committed by it—the failure to give price information, the failure to give priority information, and the failure to install the hangers—were not material breaches warranting respondent in cancelling a contract.  The materiality of a breach is, of course, primarily a factual question."   (135 Cal.App.2d at pp. 49-50.)

Galeb argues that Falk's failure to inform Galeb of its failure to submit certified payroll records excused Galeb from providing them. Galeb calls this a legal question, subject to de novo review.  But whether a defendant's failure to perform a condition excuses another condition is usually a question of fact, subject to review for substantial evidence.  (See *Sanchez v. County of San Bernadino* (2009) 176 Cal.App.4th 516, 529.)

Galeb asserts that "Even if the trial court had correctly interpreted Galeb's certified-payroll-records obligation as a condition precedent for payment, it erroneously concluded that its noncompliance was 'dispositive.'  For it should have excused Galeb's omission of such records on equitable grounds."  Put otherwise, Galeb apparently asserts that the equities favor it.  Assuming without deciding that equities have any place here, they do not favor Galeb.

As shown above, throughout the eight or so weeks of its relationship with Falk, Galeb's conduct was less than exemplary.  Not only did Galeb fail to perform its obligations under the subcontract, Galeb engaged in affirmative misconduct, blocking the work of others, stealing the copper wire that belonged to the District, misconduct ending with Slobodan's assault on Stam.  And particularly telling in this equitable regard is Galeb's abject refusal to comply with the requirement for certified payroll records.  As indicated above, California's prevailing wage statutes are not a mere technicality, to be adhered to or ignored as Galeb saw fit.  Seven full pages of the subcontract are devoted to labor law compliance, more than any other subject.  The prevailing wage law is, in short, significant (see *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 986–987), enacted to protect not only workers on public works projects, but the public as well.

31

(*Oxbow Carbon & Minerals, LLC v. Department of Industrial Relations* (2011) 194 Cal.App.4th 538, 547.)  Galeb simply flouted the contract—and the law.[11]

Finally, Galeb contends that failure by Galeb to submit payroll records did not deprive it of entitlement to payment for its work,  a contention premised on two old cases:  *Jones & Laughlin Steel Co. v. Abner Doble Co.* (1912) 162 Cal. 497 (*Jones & Laughlin)*, and *Freedman v. The Rector, Wardens & Vestrymen of St. Matthais Parish of Los Angeles* (1951) 37 Cal.2d 16 (*Freedman*).  Neither is helpful.

*Jones & Laughlin* involved a fact pattern easily distinguishable from the situation here, involving a recovery for building materials.  There, the trial court found that "no specific time was agreed on for the deliveries, except that they were to be furnished as speedily as circumstances would permit; that plaintiff substantially performed its contract, except that there were certain minor defects, for which allowance was made." (*Jones & Laughlin, supra,* 162 Cal. at p. 500.)  Making such minor deductions, the court awarded $26,481.  The Supreme Court affirmed, in this language:  "Defendant contends that plaintiff cannot recover because of the minor defects in the materials on account of which the lower court deducted $1104.14. . . .  [T]he plaintiff suing for the value, or for the price, has endeavored in good faith to perform his part of the agreement, and has substantially performed, but there are unimportant defects arising from accident or inadvertence, and which do not defeat or materially change the object of the contract, he may recover the price, less the damage caused by the defects.  (*Id.* at p. 505.)

"Good faith."  "Substantially performed."  "Unimportant Defects."  "Not materially change the object of the contract."  These descriptions hardly apply here.

*Freedman,* cited for the first time in Galeb's reply brief, is equally unavailing. There, plaintiff real estate broker signed a deposit agreement to buy two lots for $18,000. He paid $2,000 and agreed to pay the $16,000 balance in 30 days.  Title was cleared but

<hr />

[11] Slobodan admitted that he had friends work on the projects for free, claimed "volunteers."  This was a violation of the prevailing wage law, and also meant that it would have been impossible for Galeb to submit true and correct certified payroll records even if Galeb had sued on the actual subcontract.

before closing plaintiff repudiated and demanded return of his deposit. Defendant resold to another for $20,000, thus suffering no damage from the breach and realizing a profit of $2,000. Plaintiff then sought to withdraw his repudiation, and later brought an action for specific performance. The Supreme Court held that specific performance was properly denied, but that the judgment should be reversed for retrial on the issue of restitution of part of the downpayment; i.e., plaintiff should recover that payment after deducting expenses incurred by defendant, such as the broker's commission. The reason: considerations of policy justify recovery by the defaulting purchaser after wilful breach, where othewise the vendor would receive the equivalent of punitive damages instead of fair compensation. Denial of a remedy to this purchaser would mean that if the purchaser paid every installment but the last, he or she would lose all. (*Freedman, supra,* 37 Cal.2d at pp. 21-22.) No such policy pertains here. And there is no equivalency of punitive damages.

### Galeb's Common Count Cause of Action Was Properly Rejected

Galeb's second cause of action was styled "common count."[12] The trial court rejected the claim, as follows: "[I]t is well-settled that 'there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation.' (*Hedging Concepts v. First Alliance Mortg. Co.* (1996) 41 Cal.App.4th 1410, 1419, citing *William v. Gustafson* (1944) 63 Cal.App.2d 830.) Here, the Subcontract 'cover[s] compensation,' and the Court cannot substitute its own concepts of fairness in place of the parties' Subcontract. [Citation.].)"

---

[12] The leading practical treatise points out that a "common count" is "an exception to the fact pleading requirement." And, it goes on, "These are conclusions of law rather than ultimate facts, but are good against both general and special demurrers. The only explanation is that lawyers were familiar with the common counts when our pleading rules were adopted, and their continued use is justified by their simplicity and convenience. . . . [¶] But a common count is *not* a specific cause of action: '(R)ather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness, including that arising from an alleged duty to make restitution under an assumpsit theory.' " (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2014) § 6:126, pp. 6-33-6-34.)

33

Galeb contends the ruling was incorrect, that the law is otherwise. The contention has no merit.

It is perhaps enough to note that, contrary to its position on appeal, Galeb acknowledged below that the common count claim could not succeed if there were a valid contract. Specifically, in its objections to the proposed statement of decision, Galeb argued as follows: "Plaintiff contends that its Common Count claim must be allowed to proceed *if* the Court finds that there is no enforceable contract. Plaintiff asks the Court to identify in its Statement of Decision which subcontract, if any, is binding; and why. This is a critical issue that affects the viability of any judgment against Galeb. If the Court finds that the parties did not form any valid contract, Part III of the Proposed Statement of Decision is incorrect and the Court should instead rule that Galeb is entitled, based on the evidence presented, to go forward with its Common Count claim." (Italics added.) The court, of course, found a valid contract.

In any event, the law is against Galeb. *Hedging Concepts, supra,* 41 Cal.App.4th 1410, the primary case relied on by the trial court, is on point. And dispositive. There, plaintiff financial consultant sued the defendant corporation which engaged in managing, purchasing, and selling second trust deed loans. Plaintiff had entered into a contract with defendant, under which plaintiff was to assist defendant in arranging "securitizations," i.e., a bundling of secured real property loans for sale as a group to institutional investors. The trial court found that the contract conditioned plaintiff's right to payment on the procurement of a securitization; thatplaintiff had not procured a securitization, but only provided a list of companies doing that business; and that therefore the condition precedent to payment had not been satisfied. More specifically, the trial court found that plaintiff had failed to perform a required contingency and was therefore ineligible to recover for breach of contract. Despite that finding, the trial court went on to award plaintiff a quantum meruit recovery for the reasonable value of the services performed, plus costs. (*Id.* at pp. 1418.)

The Court of Appeal reversed on the quantum meruit award, explaining as follows: "A quantum meruit or quasi-contractual recovery rests upon the equitable

34

theory that a contract to pay for services rendered is implied by law for reasons of justice. [Citation.] However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation. [Citations.]

"Quantum meruit is an equitable theory which supplies, by implication and in furtherance of equity, implicitly missing contractual terms. Contractual terms regarding a subject are not implicitly missing when the parties have agreed on express terms regarding that subject. A quantum meruit analysis cannot supply 'missing' terms that are not missing. 'The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability. . . .' *Wal-Noon Corp. v. Hill* (1975) 45 Cal. App. 3d 605, 613. [Citations.]

"The trial court violated the rule that equitable entitlement to a quantum meruit payment is not implied where the parties have actual contract terms covering payment. . . . [¶] When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." (*Hedging Concepts, supra,* 41 Cal.App.4th at pp. 1419-1420.)

*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342 is similar, the Court of Appeal upholding the sustaining of a demurrer without leave to amend on a claim for quantum meruit, where the complaint alleged an actual contract. (*Id.* at p. 1388.) Doing so, the court noted as follows: "The appellate court reached a similar conclusion in *California Medical Association v. Aetna U.S. Healthcare of California* (2001) 94 Cal.App.4th 151 (*California Medical*). The plaintiff in *California Medical* initially filed a breach of contract claim alleging breach of express contract, breach of implied contract and breach of third party beneficiary contract. The trial court sustained a demurrer to each claim, but granted plaintiff 'leave to amend to attempt to allege a claim for quasi-contract.' (*Id.* at p. 157.) Plaintiff then filed an amended complaint 'seeking to state a quasi-contract claim against defendants for recovery of the amount of the

35

reasonable value of services rendered to defendants . . . .' (*Id.* at p. 158.) The amended complaint included references to several contracts that covered the same subject matter as their quasi-contract claim. (See *id.* at pp. 170–171.) The trial court sustained a demurrer to the amended complaint and dismissed the action. The appellate court affirmed, explaining that plaintiff could 'not proceed on its quasi-contract claim because the subject matter of such claim . . . was governed by express contracts . . . as specifically alleged in [plaintiff's] second amended complaint . . . ." (*California Medical, supra,* 94 Cal.App.4th at pp. 173–174; see also *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 (*Durell*) [affirming demurrer to unjust enrichment claim because plaintiff 'allege[d] the parties entered into express contracts'].) (*Id.* at p. 1389; see generally 55 Cal.Jur.3d, Restitution, § 22, p. 465 ["A quasi-contract action for unjust enrichment does not lie where express binding agreements exist and define the parties' rights. Similarly, an unjust enrichment claim does not lie where the parties have an enforceable express contract." (Fn. omitted.)].)

### The Trial Court Did Not Err In Denying Waiting Time Penalties

Galeb's third cause of action sought waiting time penalties under Public Contract Code section 10262.5, subdivision (a). The trial court ruled that Galeb failed to carry its burden of proof on that claim. The ruling was correct.

At all times relevant here, Public Contract Code section 10262.5, subdivision (a), provided as follows: "Notwithstanding any other law, a prime contractor or subcontractor shall pay to any subcontractor, not later than seven days after receipt of each progress payment, the respective amounts allowed the contractor on account of the work performed by the subcontractors, to the extent of each subcontractor's interest therein. In the event that there is a good faith dispute over all or any portion of the amount due on a progress payment from the prime contractor or subcontractor to a subcontractor, then the prime contractor or subcontractor may withhold no more than 150 percent of the disputed amount. [¶] Any contractor who violates this section shall pay to the subcontractor a penalty of 2 percent of the amount due per month for every

36

month that payment is not made. In any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to his or her attorney's fees and costs."

Like other statutes providing for waiting time penalties, Public Contract Code section 10262.5 "serve[s] a 'remedial purpose: to encourage general contractors to pay timely their subcontractors and to provide the subcontractor with a remedy in the event that the contractor violates the statute.' " (*S&S Cummins Corp. v. West Bay Builders, Inc.* (2008) 159 Cal.App.4th 765, 777, quoting *Morton Engineering & Construction, Inc. v. Patscheck* (2001) 87 Cal.App.4th 712, 720.)

But this is not a panacea, especially if, there was a dispute between the parties. And there was a dispute, as demonstrated by the evidence recited at length above.[13] Falk had several reasonable and legally tenable justifications for not paying Galeb, including Galeb's failure to perform, and Falk was entitled to offset any amounts due to Galeb against Falk's completion costs, overhead, and profit.

**Galeb's Surety Bond Claim Necessarily Fails, As Does Galeb's Attack On the Attorney Fee Award**

Galeb contends that the trial court's ruling denying its claim on the surety bond was erroneous, based on its argument on the breach of contract cause of action. Galeb makes a similar argument as to the attorney fees award. Stated otherwise, Galeb acknowledges that success on these two arguments necessarily depends on Galeb's success on one or more other issues. Or, as Galeb puts it in its reply brief, the "parties therefore agree that the outcome of the payment bond and fees and costs issues depends on the court's resolution of the other issues." We have resolved those other issues against Galeb. These last two fail with them.

---

[13] Galeb argues that there could be no dispute because one had not manifested itself at the time of termination. Passing over the apparent inaccuracy of this, there is no such pretermination requirement in the statute or in the cases. (See, for example, *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 806.)

**DISPOSITION**

The judgments are affirmed.  Falk shall recover its costs on appeal.

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Brick, J.[*]


---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.